# UNITED STATES *v.* THIRD NATIONAL BANK IN NASHVILLE ET AL.

No. 86.   Argued December 11, 1967.—Decided March 4, 1968.

*Daniel M. Friedman* argued the cause for the United States. On the brief were *Solicitor General Griswold, Assistant Attorney General Turner, Richard A. Posner* and *Barry Grossman.*

*E. William Henry* argued the cause for appellees Third National Bank in Nashville et al. With him on the

brief were *Paul A. Porter, Dennis G. Lyons, Frank M. Farris, Jr., Edwin F. Hunt* and *John J. Hooker, Jr.*

*Joseph J. O'Malley* argued the cause for appellee Camp, Comptroller of the Currency. With him on the brief were *Robert Bloom* and *Charles H. McEnerney, Jr.*

Mr. Justice White delivered the opinion of the Court.

In this case the United States appeals from a District Court decision[1] upholding the merger of Third National Bank in Nashville and Nashville Bank and Trust Company against challenge under § 7 of the Clayton Act. The court below concluded that the merger, which joined the second largest and the fourth largest banks in Davidson County, Tennessee, into a bank which immediately after the merger was the county's largest bank but since has become the second largest, would not tend substantially to lessen competition and also that any anticompetitive effect would be outweighed by the "convenience and needs of the community to be served." We disagree with the District Court on both issues. We hold that the United States established that this merger would tend to lessen competition, and also that the District Court did not point to community benefits in terms of "convenience and needs" sufficient to outweigh the anticompetitive impact.

I.

Like other urban centers in the Southeast, Nashville has grown steadily since World War II in both population and economic activity. Commercial banks, as "the intermediaries in most financial transactions,"[2] grew

---

[1] The opinion of the District Court is reported at 260 F. Supp. 869 (D. C. M. D. Tenn. 1966). Its findings of fact and conclusions of law are unreported. Probable jurisdiction was noted at 388 U. S. 905 (1967).

[2] *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 326 (1963).

along with their city. From 1955 to 1964, for example, total assets of all banks located in Davidson County increased from $548,300,000 to $1,053,700,000, an increase of 92.2%. The number of banks hardly changed. Indeed, since 1927 there has been only one new bank in the county, Capital City Bank, and at the time of this merger it had achieved only .9% of the county's bank assets. The other banks at the time of the merger, and their percentage of total bank assets in Davidson County, were First American National, 38.3%; Third National, 33.6%; Commerce Union, 21.2%; Nashville Bank, 4.8%; and three small banks, two of them located in Davidson County towns outside Nashville, .6%, .3%, and .3%.[3] The merger before us thus joined one of the three very large banks in Nashville and the one middle-sized bank. Its result was to increase from 93.1% to 97.9% the percentage of total assets held by the three largest banks and from 71.9% to 76.7% the percentage held by the two largest institutions.

The two merging banks played significantly different roles in Nashville banking. Third National was characterized by the Comptroller of the Currency as one of the strongest and best managed banks in the Nation and by the District Court as "strong, dynamic and aggressive." [4] It had "a history of innovating services or promptly providing new services," [5] a recruitment program at local universities, a continuous audit program, and a legal lending limit of $2,000,000. It had 14 branches at the

---

[3] We cite percentages of total assets for convenience, not because they are alone a valid indication of a bank's market share. The percentages of total deposits and of total loans held by the eight Davidson County banks varied insignificantly from the percentages of total assets. See the District Court's Finding of Fact No. 66.

[4] 260 F. Supp., at 881.

[5] Finding of Fact No. 91.

time of the merger and served as correspondent for smaller banks located throughout the central south.

Nashville Bank and Trust approached the merger with a more checkered history and a less dynamic present. Until 1956 it was largely a trust institution. In that year, under the direction of W. S. Hackworth, it changed its name from Nashville Trust Company and embarked on a drive to become a full-service commercial bank. This program enjoyed considerable success. Between 1955 and 1964, Nashville Bank's deposits grew from $20,800,000 to $45,500,000, and its loans and discounts from $8,100,000 to $22,800,000. In both categories it grew faster than the county average and faster than Third National. This growth, however, occurred at a substantially faster rate before 1960 than after that year. Before 1960 it was growing more rapidly than the other banks in the county, and after that year more slowly. Its share of total Nashville banking business thus declined from a high of 5.72% on June 30, 1960, to 4.83% on June 30, 1964.

The District Court made elaborate findings as to why Nashville Bank and Trust "reached a plateau on which it remained until the date of the merger" and why in this period "it was a stagnant and floundering bank." [6] From those findings, and from the broad picture of Nashville Bank's history and operations which emerges from the testimony and exhibits in this case, it appears that the principal reason was that key members of its management, the men who had been responsible for the bank's progress in the late 1950's, had advanced in age and either retired or slowed their activities. The bank's officials nonetheless made but scant efforts to recruit and advance young talent. Nashville Bank paid substan-

---

[6] Finding of Fact No. 134.

tially lower salaries than the other Nashville banks, had no funded pension plan, and conducted no systematic recruiting program. On January 1, 1964, the bank's board of directors had 13 members, of whom four were 75 or over, nine were 65 or older, and 11 were 63 or older. Of the six department heads four were 65 or older and the other two were 59. The average age of the 15 officers working outside the trust department was over 60. The District Court painted in somber hues the banking policies and the economic results which seemed to flow from the failure to hire young talent. Essentially, Nashville Bank was not aggressive or efficient, and it had stopped growing, so that it could not open branches (it had only one) or embark on a correspondent banking program. It was nevertheless an institution of substantial size, with assets of $50,900,000 and deposits of $45,500,000. It was profitable, and it offered somewhat different services, occasionally at somewhat lower rates, than its competitors.

In January 1964, the individuals who had owned controlling shares of Nashville Bank and Trust decided to sell 10,845 shares, a controlling interest, to a group of prominent Nashville citizens headed by William Weaver. The price was $350 per share. In February 1964, the Weaver group opened negotiations looking to a merger with Commerce Union Bank, Nashville's third largest. The negotiations were unsuccessful, however, because Weaver demanded $460 per share while Commerce Union offered only $360. Weaver then negotiated the sale to Third National, at a price of about $420 per share. The merger was approved by the boards of directors of both banks on March 12, 1964, and, after approval by the Comptroller of the Currency, was consummated on August 18, 1964.

## II.

The legislative history of the Bank Merger Act of 1966 [7] leaves no doubt that the Act was passed to make substantial changes in the law applicable to bank mergers. Congress was evidently dissatisfied with the 1960 Bank Merger Act as that Act was interpreted in *United States v. Philadelphia National Bank,* 374 U. S. 321 (1963), and in *United States v. First National Bank & Trust Co. of Lexington,* 376 U. S. 665 (1964), and wished to alter both the procedures by which the Justice Department challenges bank mergers and the legal standard which courts apply in judging those mergers. The resulting

---

[7] 80 Stat. 7, 12 U. S. C. § 1828 (c) (1964 ed., Supp. II). The Act provides, in relevant part:

"(5) The responsible agency shall not approve—

"(A) any proposed merger transaction which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

"(B) any other proposed merger transaction whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

"In every case, the responsible agency shall take into consideration the financial and managerial resources and future prospects of the existing and proposed institutions, and the convenience and needs of the community to be served.

.      .      .      .      .

"(7) . . . .

"(B) In any judicial proceeding attacking a merger transaction approved under paragraph (5) on the ground that the merger transaction alone and of itself constituted a violation of any antitrust laws other than [§ 2 of the Sherman Act], the standards applied by the court shall be identical with those that the banking agencies are directed to apply under paragraph (5)."

statute, however, as some members of Congress recognized,[8] was more clear and more specific in prescribing new procedures for testing mergers than in expounding the new standard by which they should be judged.

Last Term, in *United States* v. *First City National Bank of Houston,* 386 U. S. 361 (1967), this Court interpreted the procedural provisions of the 1966 Act, holding that the Bank Merger Act provided for continued scrutiny of bank mergers under the Sherman Act and the Clayton Act, but had created a new defense, with the merging banks having the burden of proving that defense. The task of the district courts was to inquire *de novo* into the validity of a bank merger approved by the relevant bank regulatory agency to determine, first, whether the merger offended the antitrust laws and, second, if it did, whether the banks had established that the merger was nonetheless justified by "the convenience and needs of the community to be served." *Houston Bank* reserved "all questions" concerning the substantive meaning of the "convenience and needs" defense. See 386 U. S., at 369, n. 1.

## III.

The proceedings that have occurred until now regarding validity of the merger here before us have been scrambled and confused, largely because the relevant statute, the 1966 Bank Merger Act, became law just prior to the trial and did not receive its first interpretation by this Court, in *Houston Bank,* until the decision below had been rendered.

The two banks agreed to merge on March 12, 1964. On April 27, 1964, they applied to the Comptroller of the Currency for approval, as the 1960 Bank Merger Act required. Pursuant to that Act, the Federal Reserve

---

[8] See, *e. g.,* 112 Cong. Rec. 2447 (remarks of Congressman Fino).

Board, the Federal Deposit Insurance Corporation, and the Department of Justice reported to the Comptroller of the Currency on "the competitive factors involved." The Federal Reserve Board reported that the merger "would have clearly adverse effects on competition" by "eliminat[ing] direct competition which exists between participants and . . . increas[ing] significantly . . . already heavy concentration . . . ." The Federal Deposit Insurance Corporation reported that "the effect of the proposed merger on competition would be unfavorable." The Department of Justice reported that the merger "would have severe anticompetitive effects upon banking competition in Metropolitan Nashville." The Comptroller of the Currency, however, concluded that the merger would not lessen competition and would "improve the charter bank's ability to serve the convenience and needs of the Nashville public." On August 4, 1964, he approved the merger.

On August 10, 1964, the United States, as this Court's decision in *Philadelphia Bank* authorized, sued in federal district court charging that the proposed merger was in violation of § 7 of the Clayton Act[9] and § 1 of the Sherman Act.[10] On August 18, 1964, the District Court refused the Government's request for a preliminary injunction staying consummation, and on that day the two banks merged.

The antitrust suit against the merger had not come to trial when, on February 21, 1966, the Bank Merger Act of 1966 took effect. Congress had devoted much attention to the impact of that Act on bank mergers still in the process of litigation. In § 2 of the Act, 80

---

[9] 38 Stat. 731, as amended, 64 Stat. 1125, 15 U. S. C. § 18.

[10] 26 Stat. 209, 15 U. S. C. § 1. The United States appealed to this Court only from the dismissal of the § 7 Clayton Act charge. The § 1 Sherman Act count is therefore not before us.

Stat. 10, Congress excluded from all antitrust liability[11] mergers which had been consummated before June 17, 1963, the date of this Court's *Philadelphia Bank* decision, and those consummated between June 17, 1963, and February 21, 1966, as to which the Attorney General had not begun litigation on February 21, 1966. However, although Congress considered amendments which would have provided antitrust immunity also for those bank mergers[12] consummated after June 17, 1963, and already the subject of litigation, a decision was made to leave those mergers subject to liability, apparently[13] because the merging parties had known, from *Philadelphia Bank,* that their consummation was with the risk of an eventual order to dissolve. Congress did provide, in § 2 (c) of the Act, that courts hearing such cases "shall apply the substantive rule of law set forth" in the Act.

Since the trial had been held after the 1966 Act took effect, and since the Comptroller of the Currency and other witnesses, directed by counsel, had addressed themselves to the statutory language contained in that Act, the District Court saw no need to remand to the Comptroller for a new opinion in light of the Act, as was ordered in *United States* v. *Crocker-Anglo National Bank,* 263 F. Supp. 125 (D. C. N. D. Cal. 1966). Proceeding to decide the case, the District Judge held that under the new Act, violation of antitrust standards was "primarily

---

[11] Liability for monopolization under § 2 of the Sherman Act was not excluded.

[12] Three mergers are in this category: the Nashville merger at issue here; a California merger, see *United States* v. *Crocker-Anglo National Bank,* 263 F. Supp. 125 (D. C. N. D. Cal. 1966); and a St. Louis merger. See H. R. Rep. No. 1221, 89th Cong., 2d Sess., 4.

[13] See, *e. g.,* 112 Cong. Rec. 2465 (remarks of Congressman Ashley).

a legal issue . . . [on which courts should make] an independent determination," while "convenience and needs of the community is, in the language of the *Crocker-Anglo* opinion, 'plainly and unquestionably a legislative or administrative determination' . . . [on which] the Comptroller's findings should not be disturbed unless they are unsupported by substantial evidence." [14] The court concluded that the merger did not offend antitrust standards and that the Comptroller's conclusion that it would benefit the community was supported by substantial evidence. The relief sought by the Justice Department was denied.

## IV.

The District Court asserted that one effect of the Bank Merger Act of 1966 was to alter the standards used in determining whether a merger is in violation of § 7 of the Clayton Act and § 1 of the Sherman Act. Essentially, the District Court mandated a return to *United States* v. *Columbia Steel Co.,* 334 U. S. 495 (1948), which this Court has held to be "confined to its special facts." *Lexington Bank,* 376 U. S., at 672. In later cases, especially *Philadelphia Bank, supra; Lexington Bank, supra; United States* v. *Aluminum Co. of America,* 377 U. S. 271 (1964); and *United States* v. *Continental Can Co.,* 378 U. S. 441 (1964), this Court has rejected the *Columbia Steel* approach to determining whether a merger will tend "substantially to lessen competition." We find in the 1966 Act, which adopted precisely that § 7 Clayton Act phrase, as well as the "restraint of trade"

---

[14] 260 F. Supp., at 874. If the District Court failed to review the issues in the case *de novo,* as this quotation suggests, it committed error. *Houston Bank, supra.* Other statements in the opinion and findings below suggest that a *de novo* judgment may also have been reached by the District Court. Our disposition of the case makes it unnecessary to decide whether undue deference was paid to the Comptroller's judgment.

language of Sherman Act § 1, no intention to adopt an "antitrust standard" for bank cases different from that used generally in the law.[15]  Only one conclusion can be drawn from the exhaustive legislative deliberations that preceded passage of the Act: Congress intended bank mergers first to be subject to the usual antitrust analysis; if a merger failed that scrutiny, it was to be permissible only if the merging banks could establish that the merger's benefits to the community would outweigh its anticompetitive disadvantages.  See *Houston Bank, supra.*  Congressman Minish spoke in tune with the language of the Act and the statements of his colleagues when he said:

> "It should also be clear from the language of paragraph (5)(b) of this bill, which establishes this single standard, that the competitive factor to be used is drawn directly from Clayton Act section 7 and Sherman Act section 1.  Thus, all of the principles developed over the last 75 years in regard to these statutes, such as the definition of relevant market and the failing company doctrine are carried forward unchanged by this proposed legislation."[16]

We therefore hold that the District Court employed an erroneous standard in applying § 7 of the Clayton Act to the merger.  In addition we hold that, appraised by the test enunciated in recent Clayton Act cases, the

---

[15] We also find in the Act no intention to alter the traditional methods of defining relevant markets in which to appraise the anticompetitive effect of a merger, and so agree with the District Court that commercial banking in Davidson County was the relevant market for appraising this merger.

[16] 112 Cong. Rec. 2451.  See also 112 Cong. Rec. 2441–2442 (remarks of Congressman Patman); 112 Cong. Rec. 2455 (remarks of Congressman Annunzio); 112 Cong. Rec. 2452 (remarks of Congressman Reuss); 112 Cong. Rec. 2655 (statement of Senator Robertson).

tendency of the merger substantially to lessen competition is apparent. Nashville had three large banks and one of middle size. In this merger the bank of middle size was absorbed by the second largest of the big banks. By the merger the market share of the three largest banks rose from 93% to 98%; the merged bank alone had almost 40% of the Nashville banking business. In addition, the record is replete with evidence that Nashville Bank and Trust was in fact an important competitive element in certain, though not in all, facets of Nashville banking. It offered somewhat different services, at somewhat different rates, from those offered by other banks, and some customers found those services desirable. Although Nashville Bank failed to increase its percentage share of the Nashville banking market after 1960, the absolute size of its business increased steadily from 1956, when it entered seriously into the commercial banking market, to the date of the merger. Throughout this period it was profitable. The record permits no conclusion that Nashville Bank was in any way a "failing" company. See *International Shoe Co.* v. *FTC*, 280 U. S. 291 (1930). On these facts, the conclusion is inescapable that the merger of Third National Bank in Nashville with Nashville Bank and Trust Co. tended to lessen competition in the Nashville commercial banking market. *Philadelphia Bank, supra.*

## V.

Because the District Court erroneously concluded that the merger would not tend to lessen competition, its conclusion upon weighing the competitive effect against the asserted benefits to the community is suspect. To weigh adequately one of these factors against the other requires a proper conclusion as to each. Having decided that the court below erred in assessing competitive impact, we should remand, so that the District Court

can perform again the balancing process mandated by the Act.[17]

There is, however, an additional reason to remand. In our view, the District Court misapprehended the meaning of the phrase "convenience and needs of the community"; it misunderstood the weight to be given the relevant factors when seeking to determine whether the anticompetitive effects of a merger are "clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served."

The purpose of the Bank Merger Act was to permit certain bank mergers even though they tended to lessen competition in the relevant market. Congress felt that the role of banks in a community's economic life was such that the public interest would sometimes be served by a bank merger even though the merger lessened competition. The public interest was the ultimate test imposed. This is clear not only from the language of the Act but from the statements of those who supported it while the Act was under consideration:

> "Mr. ASHLEY. . . . In other words, the merger must be shown to be sufficiently beneficial in meeting the convenience and needs of the community to be served that, on balance, it may properly be regarded as in the public interest.
>
> .        .        .        .        .

---

[17] Although the District Court erroneously determined the antitrust impact of the merger, its judgment that the merger was not unlawful under the Act may nevertheless have resulted from a sufficient weighing of the evidence before it. Some of the findings below suggest the view that the merger would tend to lessen competition but that this anticompetitive effect would be outweighed by benefits to the community. The argument need not be pursued, however, since we hold that the District Court also misapplied the Act's convenience-and-needs provision.

"Mr. MULTER. . . . I believe it was the intention of the Congress originally in 1960 when we enacted the Bank Merger Act that the public interest should be paramount in making any determination with reference to a merger. The words 'in the public interest' are again written into this bill now and will remain in the law so that there will be no question but that the courts and the agencies must take the public interest into account.

. . . . .

"Mr. ASHLEY. Is the gentleman saying, as I believe he is, that it is the consensus of the committee, in drafting this bill, that the public interest is to be considered as combining the consideration both of the anticompetitive factors of a particular merger on the one hand, and, on the other, the needs and convenience of the community that may derive from that merger, which, as I say, may result in a diminution of competition; in other words, that the public interest has got to involve a consideration of both of these rather considerable factors?

"Mr. STEPHENS. That is correct . . . ." 112 Cong. Rec. 2446, 2449, 2450.

It is plain that Congress considered both competition in commercial banking and satisfaction of "the convenience and needs of the community" to be in the public interest. It concluded that a merger should be judged in terms of its overall effect upon the public interest. If a merger posed a choice between preserving competition and satisfying the requirements of convenience and need, the injury and benefit were to be weighed and decision was to rest on which alternative better served the public interest.

The necessity of choosing is most clearly posed where the proposed merger would create an institution with

capabilities for serving the public interest not possessed by either of the two merging institutions alone and where the potential could be realized only through merger. Thus, it might be claimed, as it is in this case, that a combined bank would have a greater lending capacity and hence be better equipped to serve the financial needs of the community. In *Philadelphia Bank*, 374 U. S., at 370–371, this Court, acting under the 1960 Bank Merger Act, rejected the relevance of the combined bank's ability to serve Philadelphia by making large loans that could otherwise only be obtained in New York. The Court found no statutory authorization for considering such a benefit in appraising the legality of a merger. Expressions in Congress during consideration of the 1966 Act suggest that one purpose of that Act was to give this factor, not previously relevant in appraising bank mergers, suitable weight in judging their validity.[18] In the case before us the District Court's findings of fact suggest that the new bank, with a 20% greater lending limit than Third National Bank previously had, was able to make larger loans, for which Nashville area companies had previously to go to Chicago or New York. The District Court also stated that because Third National Bank operated with a higher loans-to-deposits ratio than Nashville Bank and Trust, combining their deposits and applying the Third National Bank ratio to the total increased available lending capacity in Nashville by about $2,800,000. But the District Court was not specific in describing the beneficial consequences of such results for the Nashville community, or in defining the value of these additions, especially as compared with the other, and less desirable, results of the merger. Absent such findings, the increased lending capacity of the new bank weighs very little in the balance.

---

[18] See, *e. g.,* 112 Cong. Rec. 2663 (remarks of Senator Robertson).

Congress was also concerned about banks in danger of collapse—banks not so deeply in trouble as to call forth the traditional "failing company" defense, but nonetheless in danger of becoming before long financially unsound institutions.[19]  Congress seems to have felt that a bank failure is a much greater community catastrophe than the failure of an industrial or retail enterprise, and that a much smaller risk of failure than that required by the failing company doctrine should be sufficient to justify the rather radical preventive step of an anticompetitive merger.  The Findings of Fact of the District Court included the information that Nashville Bank and Trust Company had a higher than usual percentage of unsound loans, the result of unsatisfactory procedures for investigating and judging credit risks, and that its "rating" had been changed in 1962 from "satisfactory" to "fair." The District Court drew no conclusion about the extent of the danger these conditions posed for Nashville Bank and Trust's future, about the feasibility of curative measures short of merger, or about whether other healthy aspects of the bank's condition—for instance its steady profitability, including after-tax earnings of $368,000 in 1963 [20]—removed any danger of failure in the foreseeable future.  Absent findings and conclusions of this nature,[21]

---

[19] See, e. g., 112 Cong. Rec. 2459–2460 (remarks of Congressman Multer).

[20] In Finding of Fact No. 181 the District Court concluded that the bank's "apparently good earnings record" would have been diminished, absent a merger, by "the expenditures which needed to be made for the proper maintenance of the bank."  Among these expenditures were increased salaries, automation, and establishment of additional branch offices.  There is no reason to think that such investment of accrued profits would not have been rewarded with a fair return in the form of increased future profits.

[21] The District Court did conclude, in Finding of Fact No. 184, that the merger was "a business necessity" for Nashville Bank and Trust Co.  This general conclusion, without supporting findings, hardly establishes the possibility of eventual failure.

the District Court seemed to be holding that the merger should be approved simply because Nashville Bank and Trust Company could be a better bank and could render better banking services.

The District Court, it appears, considered the merger beneficial to the community because Nashville Bank and Trust had only one branch, because it had no program of correspondent banking, because its operations were not computerized, because it emphasized real estate loans rather than commercial loans, because its management was old and unable to render sound business advice to borrowers, because it was not recruiting new talent, and because its salary scale was low. Hence a merger was justified because it would solve these problems and produce an institution which, in the words of the House Report, would be capable of

> "furnishing better overall service to the community, even though the reduction in the number of competing units, or the concentration in the share of the market in one or more lines of commerce, might result *under general antitrust law criteria* in a substantial lessening of competition." H. R. Rep. No. 1221, 89th Cong., 2d Sess., 3. (Emphasis in original.)

Undeniably, Nashville Bank and Trust had significant problems of the kind outlined in the findings of the District Court, problems which were primarily rooted in unsatisfactory and backward management. Just as surely, securing better banking service for the community is a proper element for consideration in weighing convenience and need against the loss of competition. Nor is there any doubt on this record that merger with Third National would very probably end the managerial problems of Nashville Bank and Trust and secure the better

use of its assets in the public interest. Thus if the gains in better service outweighed the anticompetitive detriment and the merger was essential to secure this net gain to the public interest, the merger should be approved.

But this analysis puts aside possible ways of satisfying the requirement of convenience and need without resort to merger. If the injury to the public interest flowing from the loss of competition could be avoided and the convenience and needs of the community benefited in ways short of merger but within the competence of reasonably able businessmen, the situation is radically different. In such circumstances, we seriously doubt that Congress intended a merger to be authorized by either the banking agencies or the courts. If, for example, just prior to this merger, an experienced banker with competent associates had offered to take over the active management of the bank or another competent businessman with a willingness to tackle the management problems of the bank had offered to buy out the Weaver interests at an acceptable price, it seems obvious that the Weaver group, which seeks to justify the merger in terms of producing an institution rendering better banking service, should not be permitted to merge and to ignore an available alternative. Otherwise, the benefits of competition, acknowledged by Congress, would be sacrificed needlessly. For the same reasons, we think it was incumbent upon those seeking to merge in this case to demonstrate that they made reasonable efforts to solve the management dilemma of Nashville Bank short of merger with a major competitor but failed in these attempts, or that any such efforts would have been unlikely to succeed.

This seems to us the most rational reading of the Act, which was a compromise and satisfied none of the pro-

tagonists in this extended controversy. The Act directs the agencies and the courts to consider managerial as well as financial resources in weighing a proposed merger. However, the Act requires as well that the "future prospects of the existing and proposed institutions" be appraised. Part of such appraisal, where managerial deficiencies exist as they do in this case, is determining whether the merging bank is capable of obtaining its own improved management. This test does not demand the impossible or the unreasonable. It merely insists that before a merger injurious to the public interest is approved, a showing be made that the gain expected from the merger cannot reasonably be expected through other means.

The question we therefore face is whether the findings of the District Court sufficiently or reliably establish the unavailability of alternative solutions to the woes of Nashville Bank and Trust Company. In our view, they do not. The District Court described the nature and extent of the bank's managerial shortcomings. It noted that the Weaver group had discussed these matters extensively with a number of persons, including bankers, and had learned that recruiting new management would be "extremely difficult" at the salaries paid by Nashville Bank. And it concluded that management procurement was difficult for banks in general and an "almost insoluble" problem for Nashville Bank and Trust.

Just how insoluble was not made clear. The District Court did not ask whether the Weaver group had made concrete efforts to recruit new management, especially a chief executive officer, who was needed most. The record seems clear that they made no proposals to any individual prospects in or outside of Nashville, save one rather casual letter to a banking acquaintance in New York, and that they neither sought nor cared to seek the help of firms specializing in finding or

furnishing new management.[22]   The court made no reference to the possibility that the new owners themselves might have taken active charge of the bank.   None of them was a banker, but their successful predecessor Hackworth had not been one before becoming president of Nashville Bank.[23]   Nor did the court assess the possibility of a sale to others who might have been willing to face up to the management difficulties over a more extended period.   We find nothing in the findings indicating that a bank with assets of $50,000,000 was simply too small to attract competent management[24]

[22] An official of a company specializing in recruitment of executives did testify for the banks at the trial.   In his opinion, recruiting executives for Nashville Bank and Trust would have been extremely difficult.

[23] The record contains the revealing statement by William C. Weaver, Jr., the leading member of the group which owned the bank at the time of the merger:

"We finally concluded before we agreed to the merger agreement with the Third National Bank that, if one of us, one of our group, was unable to go down there to the Trust Company and devote full time to its affairs—I would like to say right here that none of us in the group had any commercial banking experience, and that was a serious problem.

"But we concluded that if we were unable to devote our full time to the affairs of the bank, it would be in the best interests of the customers of the bank, the employees of the bank, the stockholders of the bank, and the Nashville community, for us to merge with the Third National Bank."

Mr. Weaver seems to have felt that one or more members of the new ownership group would have been able to furnish satisfactory executive leadership for the bank.

[24] Capital City Bank, founded in 1960 and but one-fourth the size of Nashville Bank and Trust Co., was apparently flourishing.

In this regard, a recent study concluded that "the small bank can compete successfully with the large bank—if it has the will to do so."   Kohn, Competitive Capabilities of Small Banks, 60 Banking, January 1968, at 64, reporting on the New York State Banking Department's research study, The Future of Small Banks.

or that the Weaver group, the new owners, were intransigently insisting on unreasonably conservative managerial policies. Indeed, the Weaver group included competent and experienced men who realized the desirability of improving an unsatisfactory situation. Rather than making serious efforts to do so themselves or to sell to others who would, they preferred to merge with a competing bank—a step which produced a profit of $750,000 on a two-month investment of $3,800,000.

The burden of showing that an anticompetitive bank merger would be in the public interest because of the benefits it would bring to the convenience and needs of the community to be served rests on the merging banks. *Houston Bank, supra.* A showing that one bank needed more lively and efficient management, absent a showing that the alternative means for securing such management without a merger would present unusually severe difficulties, cannot be considered to satisfy that burden.

We therefore conclude that the District Court was in error in holding that the factors it cited as ways in which this merger benefited the Nashville community were sufficient to outweigh the anticompetitive effects of the merger. The case must be remanded so that the District Court can consider again the application of the Bank Merger Act to the facts of this merger. Because the District Court heard this case before *Houston Bank* was decided, it may wish to consider reopening the record, so that the parties will have an opportunity to present new evidence in light of the intervening interpretations of the Act. The judgment below is reversed and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE FORTAS and MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, concurring in part and dissenting in part.

My understanding of the procedural structure of the Bank Merger Act of 1966,[1] based on our decision last Term in *United States* v. *First City National Bank of Houston,* 386 U. S. 361, 364, is that the Act requires the District Court to engage in a two-step process. First, the District Court must decide whether the merger, considered solely from an antitrust viewpoint, would violate the Clayton Act standard embodied in the Bank Merger Act. If it would not, the inquiry is over. If there would be a violation, then the District Court must go on to decide whether "the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." [2] In making the latter decision, the District Court must again evaluate the antitrust factor, this time in a less polar way. For a comparatively minor violation of the Clayton Act, like that in this case, obviously may be more readily outweighed by factors relating to "convenience and needs" than may a relatively serious infraction.

Turning to the application of the Act to this case, the first question is whether the merger, as an antitrust matter, would violate the Clayton Act. I continue to disagree, particularly in the banking field, with the "numbers game" test for determining Clayton Act violations which was adopted by this Court in *United States* v. *Philadelphia National Bank,* 374 U. S. 321. However, I consider myself bound by that decision, and under its dictates I concur in the Court's finding that this merger would violate the Act.

---

[1] 80 Stat. 7, 12 U. S. C. § 1828 (c) (1964 ed., Supp. II).

[2] Bank Merger Act of 1966, amending § 18 (c) (5) (B) of the Federal Deposit Insurance Act, 12 U. S. C. § 1828 (c) (5) (B) (1964 ed., Supp. II).

I also concur in the Court's decision that this case must be remanded so that there may be a new application of the second-step balancing process. In this case, which was decided before our decision in *Houston Bank, supra,* the District Court either omitted the first of the two indicated procedural steps or concluded, incorrectly, that the merger would not violate the Clayton Act.[3] In either event, the error may have caused the District Court to misconceive the antitrust "threshold" at which the second-step balancing process was intended to come into play. This, in turn, may have led the court to give the "anticompetitive effect" of the merger a different weight in the balance than was intended by the framers of the Bank Merger Act. Hence, the case must be remanded to the District Court so that it may reweigh the competing factors in light of the correct antitrust threshold.

With regard to the "convenience and needs" side of the balance, I am in accord with the Court's ruling that a merger should not be approved under the 1966 Act unless the District Court finds that the benefits conferred upon the community by the merger could not reasonably have been achieved in other ways. Unlike the Court, however, I conclude from the record that the District Court *did* make adequate findings on this issue. The record reveals that many witnesses testified that Nashville Bank had problems of real magnitude, the greatest being to find replacements for key executives. Mr. Weaver, the leader of the group which purchased control of the bank not long before the merger, testified that initially his group had intended to operate the bank themselves, but that talks with many bankers had convinced him that his group could not solve the bank's problems. The head of an executive-placement firm

---

[3] The District Court's opinion is unclear as to whether the court considered it necessary to make a discrete finding under the Clayton Act.

testified that he did not believe that he could have found new executives for Nashville Bank, in light of its overall situation.[4] Although there was testimony in rebuttal, including that of another recruiter of executives, to the effect that the problems were not unsolvable, I cannot conclude that the District Court committed error when it held that

> "While there is some conflict, the preponderance of the evidence is that it would have been practically impossible within any reasonable period of time to obtain adequate managerial replacements either from within the bank or from the outside, a product of the bank's failure . . . to provide itself with the facilities, procedures and equipment required to maintain a competitive posture." 260 F. Supp. 869, 881.

In sum, what I would consider to be the scope of the proceedings on remand is this. In light of our holding that a Clayton Act violation has been made out, further consideration of the first-step antitrust issue by the District Court is foreclosed. Believing, as I do but contrary to the Court, that the findings already made by the District Court as to the alternatives to merger are adequate, in my view the only question for the District Court to consider respecting the second step is whether, because of its character in light of the antitrust standard now set forth, the antitrust violation should yield to other factors bearing on public "convenience and needs."

---

[4] An account of Nashville Bank's overall situation appears in the Court's opinion, *ante*, at 175–176.