# Application for Approval of a Joint Operating Arrangement Under the Newspaper Preservation Act

The Attorney General is not required as a matter of law to disapprove an application for a joint operating arrangement under the Newspaper Preservation Act because the allegedly failing participant in the proposed arrangement has not been offered for sale, and no good faith efforts have been made to find a purchaser ready, willing, and able to operate it independently.

May 7, 1982

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

In connection with your consideration of the application by the Seattle Times Company and the Hearst Corporation for approval of a Joint Newspaper Operating Arrangement pursuant to the Newspaper Preservation Act, 15 U.S.C. §§ 1801–04 (1976), you have requested that this Office advise you whether approval must, on a *per se* basis, be denied if the allegedly failing participant in the proposed arrangement has not been offered for sale or if good-faith efforts to find a purchaser ready, willing, and able to operate it independently have not been made. We conclude that no such *per se* rule pertains.

## I. Background

On March 27, 1981, pursuant to the Newspaper Preservation Act (Act), 15 U.S.C. §§ 1801–04 (1976), the Seattle Times Company, as owner of the Seattle Times, and the Hearst Corporation, as owner of the Seattle Post-Intelligencer, (hereinafter Applicants) applied to the Attorney General for approval of a joint newspaper operating arrangement.[1] The Assistant Attorney General in charge of the Antitrust Division, acting under 28 C.F.R. § 48.7 (1980) and after a review of documents and information submitted in support of the Application, recommended that a hearing be held under 28 C.F.R. § 48.10 to resolve material issues of fact. Such a hearing was ordered. Attorney General Order No. 953–81, 46 Fed. Reg. 41230. Petitions for intervention were entertained and granted under

---

[1] The Act provides, *inter alia*, a limited antitrust exemption for such arrangements entered into subsequent to July 24, 1970, with the prior written consent of the Attorney General. 15 U.S.C. § 1803(b). Approval of the Attorney General is dependent upon his determination that "[n]ot more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper and that approval of such arrangement would effectuate the policy and purpose of [the Act]" *Id.* "Failing newspaper" is a defined term under the Act, 15 U.S.C. § 1802(5), and the Act contains a congressional declaration of policy. 15 U.S C. § 1801.

28 C.F.R. § 48.11, Attorney General Order No. 959–81, 46 Fed. Reg. 49228, and a hearing was held. The Administrative Law Judge who conducted the hearing has issued his Recommended Decision, including findings of fact and conclusions of law, pursuant to 28 C.F.R. § 48.10(d). Intervenors and the Antitrust Division (hereinafter Opponents) have filed exceptions to the Recommended Decision, and Applicants have filed a response. 28 C.F.R. § 48.10(e). The Application is now ripe for Attorney General consideration and decision under 28 C.F.R. § 48.14.

It is conceded that the Seattle Times is not a failing newspaper under the definition of the Act, 15 U.S.C. § 1802(5). Applicants contend that the Seattle Post-Intelligencer does fall within the statutory definition. The burden of proving this fact is on the Applicants. 28 C.F.R. § 48.10(4). The Administrative Law Judge concluded, as a matter of fact and law, that Applicants have satisfied this burden. Recommended Decision at 103. Opponents contend as a matter of law that, because Hearst has not offered the Post-Intelligencer for sale and has not made a good-faith effort to find a ready, willing, and able purchaser, Applicants have failed to carry their burden of demonstrating that the Seattle Post-Intelligencer is failing.

You have asked us to consider Opponents' position and advise you concerning it. Our analysis is set forth below.[2]

## II. Analysis

The Opponents urge that the definition of "failing newspaper" under the Act contains a *per se* "salability" rule. This rule, they say, requires denial of an application for approval of a joint newspaper operating arrangement if the allegedly failing participant has not been offered for sale or if good-faith efforts have not been made to find a purchaser (other than a competing newspaper) ready, willing, and able to operate it independently. Based on findings 156–158 of the Administrative Law Judge, this rule, the Opponents contend, mandates denial of the present application.

---

[2] We note that Opponents, particularly the Antitrust Division, urge, in addition, that the Administrative Law Judge committed an error of law in failing to admit and fully to consider their proffered evidence on incremental analysis. While we agree with your prior ruling, expressed in Attorney General Order No. 962–81 (unpublished) of November 9, 1981, that "the terms of the Newspaper Preservation Act certainly do not preclude all inquiry into financial relationships between parent corporations and their newspaper subsidiaries," we also agree with the conclusion of the Administrative Law Judge that the inclusion of the phrase "regardless of its ownership or affiliations" in the definition of "failing newspaper" precludes application of incremental analysis, as urged by Opponents, in making the determination whether a newspaper is "failing" under the Act. The legislative history of the Act makes clear that financial interrelationships may be investigated for the purposes of determining whether a parent corporation has "create[d] [a] 'failing newspaper' by artificial bookkeeping entries " S Rep No 535, 91st Cong., 1st. Sess. 5 (1969). However, the legislative history makes equally clear, *passim*, that, aside from the issue of creative bookkeeping, "whether a newspaper is failing should be determined on the basis of the operation in the particular city rather than on the basis of the sweep of the newspaper owner's business interests." *Id. See also, e.g.,* 116 Cong. Rec 23147 (question of Rep. Eckhardt and response by Rep. Kastenmeier); 116 Cong. Rec. 2006 (statement of Sen. Hruska) Incremental analysis, however packaged, would require investigation of the economic position of the Post-Intelligencer not as an independent entity but as a contributor to the overall Hearst corporate structure. Moreover, it would require that expenses of the Post-Intelligencer found legitimate by the Administrative Law Judge be disregarded and thus effectively absorbed by the remainder of the Hearst chain. This would be a form of subsidy and, as the legislative history makes clear, the Act is intended to eliminate any requirement that owners, particularly newspaper chains, subsidize their failing newspapers from external resources

244

It is clear that the rule urged by Opponents does not appear either in the plain language of the Act generally or in its definition of "failing newspaper" specifically. That definition states that

> The term "failing newspaper" means a newspaper publication which, regardless of its ownership or affiliations, is in probable danger of financial failure.

15 U.S.C. § 1802(5).

Nor does this rule appear in the regulations issued by the Attorney General to implement the Act. *See* 28 C.F.R. Part 48. Opponents contend, nevertheless, that the legislative history of the Act demonstrates that the rule urged was within the contemplation of Congress when the definition of "failing newspaper" was framed. This, however, does not seem to be the case. To the contrary, those references in the legislative history specific to a sales requirement indicate that Congress intended that the definition of "failing newspaper" would contain no such *per se* rule.

Examination of the legislative history[3] of the definition of "failing newspaper" must be approached with two considerations in mind. The first is that the definition underwent a metamorphosis during the legislative process; the second is that statements made concerning the characteristics of failing newspapers refer, alternately, depending on the context, either to such newspapers when considered under the "failing company" doctrine established by the Supreme Court in *International Shoe Co.* v. *FTC*, 280 U.S. 291 (1930), and applied to newspapers in *Citizen Publishing Co.* v. *United States*, 394 U.S. 131 (1969), or to such newspapers viewed under the less stringent definition to be enacted. Both of these considerations bear on Opponents' legislative history argument.

Opponents have pointed to a number of statements, made during hearings, made on the floor of the House and Senate, and contained in the committee

---

[3] The legislative history of the Act is extensive. It consists of four sets of hearings, a House and a Senate report, and floor debates in both Houses. Although the two bodies initially passed varying versions of the Act, there is no conference report. The Senate adopted the House version without necessity for a conference. 116 Cong. Rec. 24435

The first version of what eventually became the Act was S. 1312, 90th Cong., 1st Sess. (1967) Hearings were held on this bill, known as the Failing Newspaper Act, in July and August of 1967 and in February, March, and April of 1968. *See Hearings on S. 1312, the Failing Newspaper Act, Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary* (Parts 1–7), 90th Cong., 1st and 2d Sess. (1967–68) (hereinafter *Senate Hearings (90th)*). Although the bill was favorably reported by the subcommittee, it was not acted upon by the full Senate Judiciary Committee. The House also held hearings on a number of predecessors of the Act during the 90th Congress. *See Hearings on H.R. 19123 and Related Bills to Exempt from the Antitrust Laws Certain Joint Newspaper Operating Arrangements, Before the Antitrust Subcomm. (Subcomm No. 5) of the House Comm. on the Judiciary,* 90th Cong., 2d Sess. (1968) (hereinafter House Hearings (90th)). H.R. 19123 was not reported, and the House did not act on it. During the 91st Congress, after the Supreme Court's decision in *Citizen Publishing Co.* v. *United States,* 394 U.S. 131 (1969), additional hearings were held in both the House and the Senate. *See Hearings on S. 1520, the Newspaper Preservation Act, Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary,* 91st Cong., 1st Sess. (1969) (hereinafter Senate Hearings (91st)) and *Hearings on H.R. 279 and Related Bills to Exempt from the Antitrust Laws Certain Joint Newspaper Operating Arrangements, Before the Antitrust Subcomm. (Subcomm. No. 5) of the House Comm. on the Judiciary,* 91st Cong., 1st Sess. (1969) (hereinafter *House Hearings (91st)*) S. 1520, as amended, was reported favorably by the Senate Committee on the Judiciary in S. Rep. No. 535, 91st Cong., 1st Sess. (1969) (hereinafter *Senate Report*) as was H.R. 279, as amended, by the House Committee on the Judiciary in H.R. Rep. No. 1193, 91st Cong., 2d Sess. (1970) (hereinafter *House Report*)

245

reports[4] which suggest that Congress believed that one of the essential characteristics of a failing newspaper is that no one (except a competitor) wants to buy it. *E.g.*, 116 Cong. Rec. 1786 ("There is no market for independent ownership of a failing newspaper. . . .") (statement of Sen. Inouye). They argue from this that the willingness of "outsiders" to consider purchasing the Post-Intelligencer (Finding 157) is strong evidence that that newspaper is not "failing" within the congressional contemplation of the Act's definition. This argument, however, ignores the second consideration. When viewed in context, it is equally likely that the statements cited by Opponents refer to the unwillingness of outsiders to purchase newspapers that meet the Supreme Court's "failing company" test as it is that they refer to their unwillingness to purchase newspapers that might satisfy the Act's definition.[5] This ambiguity is in sharp contrast to those instances in the legislative history in which a requirement, under the proposed definition, to seek an alternate purchaser was discussed directly. In each such case the unequivocally expressed view was that no such requirement would exist.

In a letter addressed to Senator Eastland as Chairman of the Senate Committee on the Judiciary, which is included in the Senate Report, the Chairman of the Federal Trade Commission, an opponent of the Act, observed that under it "[N]ewspapers in economic distress may seek an exempt joint arrangement without search for an available purchaser who could truly continue an independent newspaper operation." Senate Report at 10. A similar objection was raised by Donald F. Turner, then Assistant Attorney General in charge of the Antitrust Division. It was his view that

> [A] more vital issue is at stake, and I stress this. Under present law, a company may not invoke the "failing company" defense if there are purchasers available who are not direct competitors . . . yet, this bill contains no such requirement.

*Senate Hearings* (Part 7) (90th) at 3110–11. His successor, Assistant Attorney General McLaren, evinced a similar concern. He believed that

> S. 1520 would establish a special definition for and a special failing company defense for newspapers. This definition falls short of the requirements adopted by the court in the Tucson newspaper case [*Citizen Publishing Co. v. United States, supra*]. There the court disallowed the failing company defense on the finding that the allegedly failing newspaper was "not on the verge of going out of business" and it had not been established that there were no alternative purchasers. Even assuming justification for preserving a failing newspaper through a price-fixing and profit-pooling arrangement, certainly this could not be justified . . . if there were a purchaser available who would continue independent operations.

---

[4] *See* Intervenor's Exceptions at 6–7, Antitrust Division's Exceptions at 12–13

[5] *E g.*, Senate Report at 4.

*Senate Hearings* (91st) at 296–97. Mr. McLaren expressed the same concern in the House hearings. *House Hearings* (91st) at 360. Nongovernment opponents of the Act held similar views. *E.g., House Hearings* (91st) at 419 ("H.R. 279, however, contains no requirement that an allegedly failing newspaper must seek a purchaser other than a competitor") (statement of Thomas E. Harris, Associate General Counsel, AFL–CIO). Nor were opponents of the Act the only ones to make these observations. Arthur B. Hanson, General Counsel, American Newspaper Publisher Association, a principal architect of and lobbyist for S. 1312, described that bill's intended effect on the alternate purchaser requirement as follows:

> In merger cases under section 7 of the Clayton Act, some courts have added to the requirement of proof of a "failing company" evidence of the absence of a purchaser alternative to the one seeking to acquire the stock or assets of the failing company. This limitation is not applicable to S. 1312 . . . any other newspaper would be free to become a party to the joint arrangement or to acquire ownership of the failing newspaper. . . . Under the bill there would be no obligation on the part of the failing newspaper to accept an offer from a source other than a competitor.

*Senate Hearings* (90th) at 58.[6]

An additional and persuasive indication that Congress did not believe that the Act's definition of "failing newspaper" would contain the *per se* rule advanced by Opponents is that Senator Brooke found it necessary to propose virtually the identical rule as an amendment to S. 1520. His amendment would, *inter alia*, have imposed, as a prerequisite to qualification as a failing newspaper, the requirement that "active efforts made in good faith by the managers thereof to obtain a purchaser of such newspaper publication who is willing and able to continue it in operations as a separate and independent newspaper publication have been unsuccessful." 115 Cong. Rec. 10625.[7] It seems unlikely that Senator Brooke would have offered such an amendment had there been general consensus that such a requirement was already contained in the definition of "failing newspaper." Indeed, the Brooke amendment was considered to so have the potential to work such a change that even after it had been withdrawn it was opposed as "most objectionable" by one of the principal lobbyists in favor of the Act. *Senate Hearings* (91st) at 321 (Statement of Mr. Levin).

The legislative history detailed above admittedly pertains to definitions of "failing newspaper" different from that which was finally enacted. As Opponents point out, modifications to the definition made by the House Judiciary Committee were intended to make it more stringent than the definition as

---

[6] S 1312, the predecessor of S. 1520, the Senate version of the Act, *see* note 3, *supra*, would have provided an antitrust exemption for mergers involving failing newspapers as well as for joint newspaper operating arrangements. S 1312, 90th Cong , 1st Sess. §§ 3(2) and (3), 4.

[7] A similar proposal had been put forward by a representative of the American Newspaper Guild early in the Senate hearings *Senate Hearings* (90th) (Part 1) at 219 (Statement of Mr Farson)

originally proposed and as passed by the Senate.[8] 116 Cong. Rec. 23154–55 (Statement of Rep. Railsback). In view of this, it could be argued that the final, more stringent definition incorporated the *per se* rule advanced by Opponents, even though the statements cited above indicate that the earlier versions under consideration would not have. We regard this as a dubious conclusion. In our view, it is not supported by anything specific in the legislative history, and it seems unlikely that such a sweeping (but specific) change of intent would have incorporated *sub silencio*. This is particularly so since the Act, as a whole, as is recognized by Opponents, was clearly intended to ameliorate, both as to existing and future joint newspaper operating arrangements, the Supreme Court's decision in *Citizen Publishing Co.* v. *United States, supra,* that the traditional "failing company" doctrine applied in full force to such arrangements. One of the major features of that doctrine found objectionable by the proponents of the Act when applied to joint newspaper operating agreements was its strict "alternate purchaser" requirement. We doubt that Congress would have intended to impose any new *per se* requirement in this regard, even a less stringent one, without saying so.

Opponents argue that certain statements made in the Senate Report and during the House and Senate debates relating the language "in probable danger of financial failure" (contained in the final definition of "failing newspaper") to the Bank Merger Act of 1966, 12 U.S.C. § 1828 (c) (1976) and to the case of *United States* v. *Third National Bank,* 390 U.S. 171 (1968), interpreting that Act, are specific indicators of a congressional intent to incorporate their *per se* rule into the final definition. We do not agree. First, as the Administrative Law Judge points out (Recommended Decision at 91), the House Report contains no reference to either the Bank Merger Act of 1966 or to the *Third National Bank* case.[9] This is significant because the House Judiciary Committee was the source of the final version of the definition. More important than this omission, however, is the inevitable conclusion to be drawn from a full tracing of the references in the legislative history to the Bank Merger Act of 1966 and to the *Third National Bank* decision.

Reference was first made to the Bank Merger Act of 1966 and to the *Third National Bank* case *before* the phrase "in probable danger of financial failure" was added to the definition of "failing newspaper."[10] *House Hearings* (90th) at

---

[8] In S. 1312 and H R. 19123, *see* note 3 *supra,* and in S 1520 and H R. 279, as originally introduced, the definition of "failing newspaper" read "the term 'failing newspaper' means a newspaper publication which, regardless of its ownership or affiliations, appears unlikely to remain or become a financially sound publication." The Senate subcommittee considering S 1520 amended the definition by adding in the disjunctive the phrase "is in probable danger of financial failure or" before "appears unlikely to . . . " *Senate Hearings* (91st) at 7 In the House Judiciary Committee, the phrase "appears unlikely to remain or become a financially sound publication" was deleted from the definition. 116 Cong. Rec. 23154–55 (Statement of Rep Railsback) That standard, considered to be more lenient, was, however, retained with respect to judging joint newspaper operating arrangements already in effect. 15 U S.C. § 1803(a); *House Report* at 10. As a result, the Act's definition of "failing newspaper" is relevant only in the case of joint newspaper operating arrangements entered into after July 25, 1970, which require Attorney General approval *Compare* 15 U S.C § 1803(a) *with* 15 U.S.C § 1803(b).

[9] The Administrative Law Judge is also correct in his observation that the Bank Merger Act of 1966 does not, itself, contain the quoted phrase or an approximation of it.

[10] *See* fn 8. *supra,* for a discussion of the development of the definition of "failing newspaper"

248

74. More extensive references to that Act and that case were made after the definition had been modified in the Senate subcommittee to include the phrase "in probable danger of financial failure" in the disjunctive along with the phrase "appears unlikely to remain or become a financially sound publication." Significantly, most references to the Bank Merger Act of 1966 and to the *Third National Bank* case were made while the proposed legislation contained both the "in probable danger" and the "unlikely to remain or become" language. In most of these references each phrase, not simply "in probable danger of financial failure," is tied to the Bank Merger Act of 1966 and the *Third National Bank* case. *E.g., Senate Hearings* (91st) at 7–8, 319; *House Hearings* (91st) at 13, 96.

It seems clear from the legislative history (apart from the references to the Bank Merger Act of 1966 and the *Third National Bank* case) outlined above that the unanimous interpretation of the definition of "failing newspaper," while it contained only the phrase "appears unlikely to remain or become a financially sound publication" (and while parallels were already being drawn between that definition and that act and case), was that it did not include the *per se* rule argued for by Opponents. By introducing the phrase "in probable danger of financial failure" in the disjunctive and relating both it *and* the phrase "appears unlikely to remain or become a financially sound publication" to the Bank Merger Act of 1966 and the *Third National Bank* case, the Senate subcommittee intended "to broaden the scope of the definition and not to narrow it." *Senate Hearings* (91st) at 8. Given this progression and these understandings, it hardly seems likely that references to the Bank Merger Act of 1966 and to the *Third National Bank* case were intended to serve to incorporate a *per se* rule concerning salability derived from either into the language "in probable danger of financial failure." Rather, it is our view that, taken as a whole, the references in the legislative history to the Bank Merger Act of 1966 and the Supreme Court's interpretation of it in *Third National Bank* indicate a general rather than a specific congressional intent. This is that the loss of newspapers (like the loss of banks) is of such serious detriment to the public that the risks entailed in applying the normal "failing company" doctrine to them cannot be tolerated. *See United States* v. *Third National Bank,* 390 U.S. at 187.

Even if Congress had intended to import the entire holding of *Third National Bank* into the Act's definition of "failing newspaper," Opponents' position could not be sustained on a *per se* basis. In *Third National Bank* the Supreme Court required the investigation of the possibility of a sale as one means of establishing the "unavailability of alternate solutions to the [management] woes of the Nashville Bank and Trust Co." *United States* v. *Third National Bank,* 390 U.S. at 190–191. It went on to hold that

> The burden of showing that an anticompetitive bank merger would be in the public interest because of the benefits it would bring to the convenience and needs of the community to be served rests on the merging banks. *Houston Bank, supra.* A showing that one bank needed more lively and efficient management, absent a

> showing that the alternative means for securing such management
> without a merger would present unusually severe difficulties,
> cannot be considered to satisfy that burden.

*Id.* at 192. Thus it would appear that the requirements of the *Third National Bank* case, as applied to an allegedly failing newspaper, could be satisfied by proof that the introduction of new management (whether or not under a new owner) would not improve the situation. The Administrative Law Judge seems to have made such a finding (Finding 109).[11]

## Conclusion

The legislative history of the Act does not support the proposition that Congress intended that the definition of "failing newspaper" contain a *per se* rule requiring that before a newspaper may qualify as such it must have been offered for sale and good-faith efforts must have been made to find a purchaser ready, willing, and able to operate it as an independent publication.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[11] We note that Intervenors have disputed this finding Intervenors' Exceptions at 12 *et seq.* Another of the Administrative Law Judge's conclusions (Finding 158) ("The Post-Intelligencer could in all probability be sold at fair market value to a person or firm who could, and would, continue it in operation as an independent metropolitan daily.") can be read as inconsistent with it. The factual issue will have to be resolved on the basis of the entire record before the Attorney General 28 C FR. § 48.14(a).*

*NOTE: The Attorney General approved the joint operating arrangement on June 15, 1982. In subsequent litigation challenging it, the district court held that alternatives to a joint operating arrangement were relevant to a determination whether a newspaper qualifies for an antitrust exemption under the Newspaper Preservation Act, and that such alternatives had not been adequately explored by the parties to the agreement in this case. 549 F. Supp. 985 (W D Wash. 1982) The court of appeals agreed as to the legal standard, but reversed on the merits, holding that the Times Company and Hearst had sufficiently negated the possibility that any such alternatives were available. 704 F.2d 467 (9th Cir. 1983) The Supreme Court denied certiorari on October 11, 1983. 464 U S 892 (1983). Ed.