Stephen R. VIAL

v.

FIRST COMMERCE CORPORATION, First National Bank of Commerce, New Orleans Bancshares, Inc., and Bank of New Orleans and Trust Company.

Stephen R. VIAL

v.

C.T. CONOVER Comptroller of the Currency, and First Commerce Corporation, First National Bank of Commerce, New Orleans Bancshares, Inc., and Bank of New Orleans and Trust Company, Intervenor-Defendants.

Stephen R. VIAL

v.

Hunter O. WAGNER, Jr., Commissioner of Financial Institutions of Louisiana, and First Commerce Corporation, First National Bank of Commerce, New Orleans Bancshares, Inc. and Bank of New Orleans and Trust Company, Intervenor-Defendants.

Civ. A. Nos. 83–1908, 83–2021, 83–2261.

United States District Court,
E.D. Louisiana.

May 19, 1983.

Louis R. Koerner, Jr., New Orleans, La., for plaintiff.

Charles W. Lane, III, Herschel L. Abbott, Jr., Howard E. Sinor, Jr., New Orleans, La., for First Commerce Corp. and First Nat. Bank of Commerce.

Robert E. Barkley, Jr., Louis Y. Fishman, Frances R. White, III, New Orleans, La., for New Orleans Bancshares and The Bank of New Orleans and Trust Co.

Eugene J. Metzger, Michael E. Friedlander, Samuel S. Jones, Jr., Washington, D.C., for First Commerce Corp., First Nat. Bank of Commerce, New Orleans Bancshares and The Bank of New Orleans and Trust Co.

Charles H. McEnerney, Jr., Donald N. Lamson, Washington, D.C., Ruth Morris Force, New Orleans, La., for C.T. Conover, Comptroller of the Currency.

William J. Guste, Jr., Atty. Gen., Louis Jones, Maureen J. Feran, Asst. Attys. Gen., New Orleans, La., for Hunter O. Wagner, Jr., Com'r of Financial Institutions of Louisiana.

## ORDER

CHARLES SCHWARTZ, Jr., District Judge.

This matter came on for hearing before the Court on May 17, 1983, on the following motions of the plaintiff: (1) a motion for summary judgment against the Comptroller of the Currency in Civil Action 83–2021, contending that the Louisiana Bank Holding Company statute, LSA–R.S. 6:1001 et seq., prohibits the proposed merger, or in the alternative, for abstention in favor of a determination by the Louisiana state courts on any important but unsettled issues of Louisiana law; (2) a motion for preliminary injunction under 5 U.S.C. § 701 et seq. against C.T. Conover in Civil Action 83–2021, based on, and only on, the contention that the procedures followed by the Comptroller in approving the merger were improper; (3) a motion for preliminary injunction and a writ of mandamus to the Commissioner of Financial Institutions in Civil Action 83–2261, based on his failure to take action to order the merging parties to cease and desist from the allegedly illegal merger; and (4) a motion for a sixty-day stay of all three actions, within which to present his claims that the merger violates the Bank Holding Company Act to the Federal Reserve Board. In addition, at the hearing, the Court raised the issue of whether the automatic stay provision of the Bank Merger Act would be applicable in the instant case, and if so, whether the stay should be lifted.

After the presentation of evidence and oral argument on these motions, the Court took the matter under submission. Before setting forth the Court's rulings, and the bases thereof, a complete history of the case and the proposed merger is in order.

On or about November 9, 1982, defendants First Commerce Corporation ("FCC")

and New Orleans Bancshares, Inc. ("NOBS") entered into an Agreement and Plan of Reorganization ("the Agreement"), whereby the Bank of New Orleans and Trust Company ("BNO"), a state-chartered bank, would be merged into First National Bank of Commerce ("FNBC"), a national bank, with FNBC being the surviving institution.

FCC, a Louisiana business corporation is a one-bank holding company registered under the federal Bank Holding Company Act of 1956, as amended. FCC was organized in 1970 primarily for the purpose of holding all of the outstanding capital stock of FNBC. To date, except for dividends and interest on certain investments, FCC has not derived significant revenue from sources other than FNBC.

FNBC is a national bank chartered under the laws of the United States, domiciled in New Orleans, Louisiana. FNBC conducts a general banking business through its main office and thirteen branches in Orleans Parish, Louisiana. FNBC offers the services generally performed by depository institutions of similar size and character, including the maintenance of checking, savings and time deposit accounts, trust services, the sale of certificates of deposit, the providing of safe deposit boxes, the making of secured and unsecured individual and commercial installment and fixed term loans, and the granting of residential and commercial real estate loans.

NOBS was organized under Louisiana law in January, 1970 as a one-bank holding company. Substantially all of NOBS' business activities are conducted through BNO, its banking subsidiary, and BNO Leasing Corporation, a subsidiary of BNO.

BNO is a Louisiana banking association. BNO also offers the services generally performed by depository institutions of similar size and character. BNO's offices all are located in Orleans Parish; it also provides correspondent services for other banks located principally in Louisiana and southern Mississippi.

On December 28, 1982, the bank defendants filed an application to merge with the United States Comptroller of the Currency ("OCC") pursuant to the Bank Merger Act, 12 U.S.C. § 1828(c). The application was accepted for filing on January 4, 1983. The banks thereupon published notice of filing in a local newspaper of general circulation at required periodic intervals.

The OCC is charged with a broad range of bank regulatory responsibilities that involve supervision of national banks in the areas of chartering, branching, bank examinations, corporate structure, investments, conversions, liquidations, mergers, and capital adequacy, among others. As the principal regulator of the national banking system, the OCC is responsible for insuring the safety, soundness and competitiveness of that system as a whole, as well as the soundness and viability of individual national banks.

Upon receipt of the application from the defendant banks, the Comptroller's Office established a public file.

The public comment period on the instant merger application expired on March 2, 1983, twenty-one days following the last required notice by publication.

At the time the application was accepted for filing, the Comptroller requested competitive factor reports on the transaction from the Justice Department, the FDIC, and the Board of Governors of the Federal Reserve System. Receipt of the request was acknowledged by all three agencies on that same date, January 4, 1983.

Both the Federal Reserve and the Justice Department made reports on the application transaction. The FDIC did not. The Justice Department found the merger would not have a significantly adverse effect on competition. The Federal Reserve found the effect on competition to be "adverse," though not in violation of the federal antitrust laws.

On April 12, 1983, the OCC approved the merger, and subsequently issued a decision explaining its action. Following the approval, the OCC notified the Attorney General, pursuant to the requirements of 12 U.S.C. § 1828(c)(6). The Attorney General

did not move to enjoin the merger within the thirty-day period provided by the statute. The merger is now scheduled to proceed on May 23, 1983.

Plaintiff Stephen R. Vial ("Vial") is an individual residing in Orleans Parish, Louisiana, suing only on his own behalf, and not on behalf of any class.

On December 30, 1982, and February 4, 1983, Louis R. Koerner, Jr. ("Koerner") counsel for plaintiff, submitted FOIA requests to the Comptroller of the Currency. In these requests, Koerner stated that he represented clients who desired to comment on the proposed merger. He also requested that he be notified of any opportunity to so comment. At that time Koerner did not represent Vial.

On January 18 and March 2, 1983, the Comptroller responded to Koerner's FOIA requests but was silent as to Koerner's request for notification of any comment period.

On March 17, 20, and 29, 1983, Koerner submitted written materials in opposition to the application, and on March 20 and April 15, 1983, he submitted written requests for a hearing.

On April 8, 1983, the Comptroller acknowledged receipt of Koerner's letters of March 17 and 20, 1983, with enclosures in opposition to the application, and advised Koerner that these would be considered even though the public comment period had ended, since the office had failed to inform him of the expiration date previously. The office did not respond to Koerner's request for a hearing.

Upon approval of the merger, Koerner was given notice of the OCC's action and a copy of the decision.

Prior to the OCC approval, by letters dated January 19 and February 4, 1983, Koerner also submitted FOIA requests to the Board of Governors of the Federal Reserve System ("the Fed."). In these requests, Koerner stated that he represented clients who desired to comment on the proposed merger, and asked that he be notified of any opportunity to so comment.

After previously notifying Koerner that a response would be forthcoming, the Fed., by letter dated March 10, 1983, informed Koerner that the merger at issue was subject to the jurisdiction of the OCC.

Similarly, by letter dated January 5, and February 14, 1983, the Fed. advised the bank defendants, in response to their inquiry, that an application for merger to the Fed. would not be required.

Also, prior to the approval, by letter dated March 20, 1983, Koerner contacted defendant Hunter O. Wagner, Jr. ("Wagner"), Commissioner of Financial Institutions of the State of Louisiana, with regard to the planned merger.

The issuance of approvals for proposed mergers of state banks and bank holding companies are matters which are subject to the jurisdiction of this agency, if the resulting institution is a state bank.

By his letter of March 20, 1983, Koerner requested information from this agency regarding any merger application by the defendant banks and any responsive actions taken by defendant. The defendant, Wagner, by letter dated March 23, 1983, refused to disclose what was in his files.

By means of the letter of March 20, 1983, defendant Wagner was also requested to issue an order requiring the parties to the merger to cease and desist. Koerner was not given a response to this request.

On March 30, 1983, Koerner forwarded additional information to defendant Wagner.

On February 23, 1983, prior to the OCC having approved the proposed merger, Koerner filed suit in this Court on behalf of Frederic P. Aiken ("Aiken") against defendants, which was docketed as Civil Action No. 83–866 and allotted to Section "A" of the Court. This suit complained that the proposed merger constituted a violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, as well as Section 7 of the Clayton Act, 15 U.S.C. § 18, and sought to enjoin the transaction.

Shortly after filing the first suit in federal court, Koerner filed a second suit on behalf of Aiken in the Civil District Court for the Parish of Orleans, State of Louisiana, No. 83–3265, which also sought to enjoin the merger. The facts recited in the state court suit were identical in all material respects to the facts recited in the first suit filed on behalf of Aiken in this Court. The only difference in the two suits was the fact that plaintiff claimed a violation of the Louisiana antitrust laws in the state court action.

On March 14, 1983, the suit filed on behalf of Aiken in the state court was removed to this Court, was docketed as Civil Action No. 83–1195, and was subsequently transferred to Section "A" as a case related to Civil Action No. 83–866. On March 18, 1983, a motion was filed with this Court to withdraw Aiken as the plaintiff in Civil Action No. 83–866 and to substitute Louis R. Koerner, Jr. as the plaintiff in that action. This Court denied the motion of Koerner to substitute himself as plaintiff and dismissed the suit with prejudice as to Aiken in Civil Action Nos. 83–866 and 83–1195.

During a conference on March 18, 1983, Koerner advised the Court that he believed that he had "another plaintiff" and that he would refile the suit in state court. Subsequently, a state court action on behalf of Vial was filed by Koerner on March 22, 1983, in the Civil District Court for the Parish of Orleans, Docket No. 83–4834. The state action on behalf of Vial alleges the same facts as the two prior actions filed on behalf of Aiken, and, like Aiken's state court suit, alleges that the proposed bank merger violates the Louisiana antitrust laws, LSA–R.S. 51:122 *et seq.* In addition, the state court action filed on behalf of Vial alleges, for the first time, that the proposed bank merger violates the Louisiana Bank Holding Company Act, LSA–R.S. 6:1001 *et seq.* Similarly, the Vial suit also seeks to enjoin the proposed merger.

Shortly thereafter, on April 18, 1983, Koerner instituted suit on behalf of Vial against C.T. Conover, Comptroller of the Currency, in the Civil District Court for the Parish of Orleans, Docket No. 83–4834, alleging many of the same facts and reciting the same state statutes as are present in the suits originally filed in the Civil District Court for the Parish of Orleans, plus the further allegations that the OCC violated provisions of the National Bank Act, 12 U.S.C. § 36, the Bank Merger Act, 12 U.S.C. § 1828(c), and the Administrative Procedure Act, 5 U.S.C. § 701. This suit also attempts to enjoin the merger by seeking to nullify the OCC's approval.

The Vial suit against the banks was removed to this Court on April 13, 1983, on the grounds that plaintiff's claim was entirely federal in nature. On April 20, 1983, the OCC also removed his suit to this Court, Civil Action No. 83–2021, pursuant to 28 U.S.C. § 1442(a)(1).

On April 27, 1983, Vial instituted suit in the 19th Judicial District Court for the Parish of East Baton Rouge, Docket No. 266–248, against Hunter O. Wagner, Jr., Commissioner of Financial Institutions of Louisiana ("Commissioner"). This suit seeks effectively to enjoin the consummation of the merger by seeking to have the act of the Commissioner to issue a "Certificate of Merger" declared illegal. On May 2, 1983, the Commissioner removed this suit to the United States District Court for the Middle District of Louisiana, which Court that same day transferred the matter to this Court.

The matter then came on for hearing before the Court on May 4, 1983, on several motions of the parties. After oral argument on that same date, the Court issued an order (along with reasons) as follows: (1) granting the motions of the bank defendants in C.A. 83–1908 to intervene in each of the other two suits above; (2) denying the motions of plaintiff to remand to state court both the suit against the bank defendants, C.A. 83–1908, and the suit against Mr. Wagner, C.A. 83–2261; (3) granting the motions of the bank defendants in C.A. 83–1908 to consolidate all three suits above; (4) denying the motion of plaintiff for ex parte consideration of mo-

tion for summary judgment and of motion for preliminary injunction in the suit against the bank defendants, C.A. 83–1908; (5) granting the motion of plaintiff to schedule a hearing on a preliminary injunction in the suit against Mr. Conover, C.A. 83–2021, said hearing being scheduled for May 17, 1983; (6) denying the motion of plaintiff for shortened discovery in the suit against the bank defendants; and (7) denying the motion of plaintiff to strike in the suit against the bank defendants.

The motions before the Court at this time involve some of the same issues of law addressed by the Court in its order of May 4, 1983, with regard to plaintiff's motion to remand.

As the Court ruled at that time, plaintiff's actions in this case, by whatever pleading, in fact constitute a challenge to the merger transaction approved by the OCC pursuant to the Bank Merger Act of 1966, 12 U.S.C. § 1828(c), and as such must be evaluated in light of that statute.

That law provides:

In any judicial proceeding attacking a merger transaction approved under paragraph (5) on the ground that the merger transaction alone and of itself constituted a violation of any antitrust laws other than section 2 of Title 15 [section 2 of the Sherman Antitrust Act], the standards applied by the Court shall be identical with those that the banking agencies are directed to apply under paragraph (5). 12 U.S.C. § 1828(c)(7).

The standards set forth in the 1966 Act are as follows:

The responsible agency shall not approve—

(A) any proposed merger transaction which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

(B) any other proposed merger transaction whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served. 12 U.S.C. § 1828(c)(5).

Subparagraph (A) of this section tracks the language of the Sherman Antitrust Act, Section 2, 15 U.S.C. § 2, and subparagraph (B) of this section tracks the language of Section 1 of the Sherman Act and Section 7 of the Clayton Act, 15 U.S.C. §§ 1, 18. In addition, the last sentence of this section provides that even a merger where the effect "may be substantially to lessen competition" shall be approved if the anticompetitive effects are "clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served."

The language of the Bank Merger Act of 1966, its legislative history and the relevant case law all confirm that it was intended to impose a uniform federal standard to be applied in any judicial review of a bank merger of *insured banks,* be they state or federally chartered. House Report (Banking and Currency Committee) No. 1221, January 24, 1966, summarized the legal effect of the bill as follows: "The bill would establish a single set of standards for the consideration of future mergers by the banking supervisory agencies, the Department of Justice, and the courts under the antitrust laws ... U.S.Code Cong. & Admin.News 1860 (1966)."

. Thus, there is no question but that it was Congress' intent to create a pervasive regulatory scheme designed to assure "uniformity" among the federal banking supervisory agencies, the Department of Justice and the judiciary through the establishment of a single set of standards for testing the legality of all bank mergers.

Moreover, as the term "antitrust laws" in the Bank Merger Act is not limited to fed-

eral antitrust laws, since the Act defines the term "antitrust laws" as the Sherman Act, the Clayton Act, and "any other acts in *pari materia*," U.S.Code Cong. & Admin. News at 1865, a court proceeding testing the legality of a bank merger must in its decision yield to the standards set forth in the Bank Merger Act.

Plaintiff contends, however, that it is the Bank Holding Company Act ("BHCA"), 12 U.S.C. § 1842(a), not the Bank Merger Act, which applies to the merger in this case. If this contention is correct, plaintiff is correct in further arguing that approval of the Federal Reserve Board, not the OCC, is necessary prior to merger, and that any challenge to the merger must first be taken before the Fed. and subsequently to the appropriate circuit court of appeals.

Furthermore, plaintiff contends that the Louisiana Bank Holding Company Act, LSA–R.S. 6:1001 et seq., is also applicable to the merger in this case, pursuant to 12 U.S.C. § 1846 and the holding of the United States Supreme Court in *Whitney National Bank in Jefferson Parish v. Bank of New Orleans and Trust Co.*, 379 U.S. 411, 418–19, 424–25, 85 S.Ct. 551, 556, 559, 13 L.Ed.2d 386 (1965). Again, plaintiff's arguments are correct, if the BHCA and not the Bank Merger Act, applies to this case.

In order to address these contentions of the plaintiff, it is first necessary to explain fully the proposed merger in this case. The following diagram is helpful in understanding the exact nature of the proposed merger.

Under the Plan of Reorganization proposed by the defendant banks and approved by the OCC, the merger is to take effect as follows. First, NOBS, which currently owns all of the stock of BNO, will merge into NOBS Financial Corporation, all of the stock of which is owned by BNO. As a result of this preliminary merger, shareholders of NOBS will become shareholders of BNO and NOBS will cease to exist. In consideration of this preliminary merger, each share of NOBS common stock will be converted into one share of BNO common stock immediately before such merger. Thus, after the preliminary merger, BNO stock will no longer be owned by NOBS or by any other bank holding company. BNO will have become a publicly held state banking association.

Immediately after the preliminary merger just described, BNO will merge into FNBC, and the separate existence of BNO will cease pursuant to 12 U.S.C. § 215a(e). In consideration of this merger, shareholders of BNO will receive 1.5 shares of FCC common stock for each share of BNO stock. FCC will then continue as a bank holding company with a one-bank subsidiary, the newly-expanded FNBC.

▮ The provisions of the BHCA, 12 U.S.C. § 1842(a)(3)(4) and (5), upon which plaintiff relies in his application for a stay, provide as follows: "(a) It shall be unlawful except with the prior approval of the Board ... (3) for any bank holding company to acquire direct or indirect ownership or control of any voting shares of any bank if, after such acquisition, such company will directly or indirectly own or control more than 5 per centum of the voting shares of such bank; (4) for any bank holding company or subsidiary thereof, other than a bank, to acquire all or substantially all of the assets of a bank; (5) for any bank holding company to merge or consolidate with any other bank holding company."

A careful reading of these provisions of the BHCA clearly shows that they are not applicable to the proposed merger. Each of these provisions applies only to acquisitions or mergers by a bank holding company, not a bank. The proposed merger, on the other hand, provides for FNBC, which is a bank, to merge with BNO and thereby acquire the business and properties of BNO.

Plaintiff would apparently have this Court disregard the corporate forms of the proposed transactions, and find FNBC to be, in effect, the alter ego of FCC. The same argument was advanced by the plaintiff and rejected in *Marshall & Isley Corp. v. Heimann,* 652 F.2d 685, 699, n. 23 (7th Cir.1981), wherein the Court explained that the BHCA

"constitutes an allocation of agency responsibility between the Comptroller and the Board. Acquisition of a bank by a bank subsidiary of a bank holding company must be approved by the Comptroller under the Bank Merger Act, while acquisition of a bank directly by a bank holding company must be approved by the Board under the Bank Holding Company Act."

Rather than having found a loophole in the BHCA, the bank defendants have simply proposed a merger which Congress intended to be subject to Comptroller, not Federal Reserve Board, approval. As stated by the Court in *Leuthold v. Camp,* 273 F.Supp. 695, 702 (D.Mont.1967), *aff'd* 405 F.2d 499 (9th Cir.1969), *cited in Marshall, supra:*

The Act itself makes formal and perhaps arbitrary distinctions between asset and stock acquisitions, between bank and bank holding company acquisitions. Under these conditions it is the Court's opinion that it should not, by disregarding the corporate forms, abolish the distinctions that Congress created.

*See also South Dakota v. National Bank of South Dakota,* 335 F.2d 444, 448–49 (8th Cir.1964), *cert. denied* 379 U.S. 970, 85 S.Ct. 667, 13 L.Ed.2d 562 (1965), wherein the Court stated, "The words in the statute 'other than a bank' clearly show the intention of Congress not to require a bank acquiring the assets of another bank to obtain Board approval."

Finally, it should be noted that the Federal Reserve Board has in this case, as in

the above-cited cases, been apprised of the details of the proposed transaction and has explicitly stated to the defendant banks as well as to plaintiff and his counsel that it lacks jurisdiction thereof.

Therefore, the Court finds that it would be improper to disregard corporate structures and pierce the corporate veil, as it were, when Congress has clearly seen fit to make these distinctions in the BHCA. Furthermore, when as here, all parties have been fully apprised of the proper forum for consideration of the proposed merger, plaintiff's application for a stay in which to proceed to the Fed. is all the more inappropriate.

Accordingly, plaintiff's motion for a sixty-day stay is DENIED.

For the reasons just stated, then, not only is the BHCA inapplicable to the proposed merger, but so is the Louisiana Bank Holding Company Act. It is only the BHCA, and not the Bank Merger Act, which makes provision for state banking laws. As stated above, the Bank Merger Act sets up preemptive standards for all bank mergers involving a federally chartered bank.

In any case, even were this not so, the Louisiana Bank Holding Company Act itself does not prohibit the proposed merger.

█ The Louisiana Bank Holding Company Act, La.R.S. 6:1001 *et seq.*, was enacted in 1962 for the stated purpose of prohibiting the acquisition of control by existing bank holding companies and their "subsidiaries" (as defined in the Act) of *additional* banking institutions. *Id.* at Section 1001. A careful reading of the operative provisions of the Act, as more fully discussed below, with reference to the Whitney National Bank litigation which spawned the Act (see *Whitney National Bank in Jefferson Parish v. Bank of New Orleans and Trust Company,* 323 F.2d 290 (D.C.Cir.1963), *rev'd. on other grounds,* 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965)) reveals that the original purpose of the Act was to prohibit banks from using the holding company device to circumvent existing laws prohibiting any bank from establishing a branch office in a parish other than the parish of its domicile. *See* La.R.S. 6:54 and 12 U.S.C. § 36(c). But for the enactment of the Act, it may have been possible for a bank holding company owning a bank located in one parish to engage in business in other parishes simply by organizing one or more new banks, or purchasing one or more existing banks, in those parishes because the additional banks, organized and operated under their own charters, would arguably not be "branches" of the original bank. Absent the new legislation, it may have been possible for a bank holding company to own or control a separate bank in every parish in the state (each of which could have an unlimited number of branches in its parish) and thereby engage in significant statewide banking operations which would not otherwise be permitted.

In the Whitney Bank situation, the Whitney National Bank in New Orleans had adopted, and effectuated, a plan of reorganization pursuant to which it formed a holding company which was to own two banks— the existing New Orleans bank and newly-chartered Jefferson Parish bank. The express purpose of the plan was to allow the Whitney Holding Corporation to engage in the banking business in two parishes through its two wholly-owned banks. *Id.* at 301. The Whitney's plan of reorganization was essentially complete except for the issuance by the Comptroller of the Currency of a certificate of authority for the Jefferson Parish bank to commence business. At that point, several state banks sued the Comptroller to enjoin him from issuing the certificate. Simultaneously, the Louisiana legislature adopted the Bank Holding Company Act, which the Governor designated as emergency legislation so that it became effective immediately. *Id.* at 294, 295. There can be no doubt that the legislature perceived the Whitney's plan as a clear threat to the existing prohibition against multi-parish branching and adopted the Act in order to prevent circumvention of the prohibition by a holding company.

In the present case there is no proposal to increase the number of banks owned or controlled by a bank holding company as defined in the Act. Moreover, there is no

proposal to acquire ownership or control of additional banking institutions outside of the Parish of Orleans. As a matter of fact, the proposal reduces the number of banks owned by holding companies as defined in the Act in that NOBS will cease to exist as a holding company and BNO will be merged with FNBC, resulting in a single banking entity.

A close examination of the relevant provisions of the Act further supports the conclusion that the legislation serves to prohibit multi-parish banking and not, as plaintiff seems to suggest, to prevent any expansion of banks through acquisitions.

█ The Act does prohibit certain acquisitions of stock or assets which would result in a holding company owning more than one bank, but it does not prohibit the merger of a publicly held bank with a bank which is owned or controlled by a holding company, nor does it prohibit the acquisition of bank assets by a bank owned by a holding company. A careful reading of the statute, with particular focus on the definitions contained in Section 1002 reveals a clear statutory intent to permit such transactions. The key definition is that of the word "subsidiary" in Section 1002 E. That section defines a "subsidiary" as a "company" which is owned or controlled by a bank holding company. "Company" is defined in Section 1002 C as "any corporation, business trust, partnership, association, or similar organization." The definition of the term "company" does not include a bank, which is separately defined in Section 1002 D as "any commercial bank, savings bank, trust company or similar organization..." The definitional sections, therefore, clearly distinguish between a "company" and a "bank" and do not include a bank within the definition of the word "subsidiary."

The obvious intentional distinction between the two terms is reinforced by numerous other provisions of the Act which also draw a clear distinction between a "company" and a "bank." For example, a "bank holding company" is defined in Section 1002 A as "any company ... including a bank." The adjunctive phrase "including

a bank" was necessary because the term "company" alone was insufficient to include banks within the definition of a bank holding company. The distinction is further reinforced by the language in Section 1003(1) which speaks of "a company or a bank" becoming a bank holding company and by Section 1004 which applies the penalties for violations of the Act to "any bank, bank holding company, company or any subsidiary of any of them." The use of both terms "company" and "bank" in these provisions indicates the drafters' recognition that the term "company" does not include, and was not intended to include, a bank, for if it was so intended, the specific reference to a bank in all of these provisions would have been unnecessary. Finally, where the legislature did make reference in the Act to banks owned by holding companies, it used the terms "banking subsidiary" and "subsidiary bank" to make clear that in those provisions it was referring to something other than a "subsidiary." *See e.g.* La.R.S. 1002 B(3), (4) and 1003(7).

Because it is not entirely clear from plaintiff's petition which subsection or subsections will allegedly be violated by the proposed transaction, each of the prohibitions contained in Section 1003 will be addressed in order.

Subsection (1) forbids any action which results in a "company or a bank" becoming a bank holding company if it will own or control more than 25% of the voting shares of more than one bank while at the same time owning or controlling any voting shares of any other bank. The provision is clearly directed at new bank holding companies rather than existing bank holding companies such as NOBS and FCC. As a result of the proposed transaction, no company or bank will *become* a bank holding company, and the only remaining bank holding company, FCC, will not at any time own shares of more than one bank. Rather, it will own *all* the voting shares of one bank, FNBC, and *no* shares of any other bank. Consequently, one cannot seriously argue that the proposed transaction will violate Subsection (1).

Subsection (2) prohibits existing bank holding companies or their "subsidiaries" from acquiring ownership or control of voting shares of a bank if, thereafter, such holding company or "subsidiary" will directly or indirectly own or control more than 25% of the voting shares of more than one bank while at the same time owning or controlling any voting shares of another bank. As stated above, the only remaining bank holding company, FCC, will not own shares of more than one bank. It will own all shares of FNBC and no shares of any other bank. This subsection is as clearly inapplicable to the proposed transaction.

Subsection (3) prohibits a bank holding company or "subsidiary" thereof from acquiring all or substantially all of the assets of a bank. Although the plaintiff apparently contends that the proposed transaction will be an acquisition of assets, the simple fact is that a merger is not an acquisition of assets as contemplated by the statute. There are well recognized distinctions in corporate law between various types of transactions such as asset acquisitions, stock acquisitions and mergers. Although all of those transactions may be designed to accomplish somewhat similar results, they do so in substantially different ways and are treated as separate and distinct types of transactions in the corporate laws of virtually all jurisdictions, including Louisiana. *McCarthy v. Osborn,* 223 La. 305, 65 So.2d 776 (La.1953); *U.S. v. Seattle-First National Bank,* 321 U.S. 583, 64 S.Ct. 713, 88 L.Ed. 944 (1944); *Commonwealth v. Wilson Products, Inc.* 412 Pa. 78, 194 A.2d 162 (Pa.1963). In an acquisition of assets transaction the acquiring party does not necessarily assume the obligations and liabilities of the seller. Additionally, the seller may not ever lose its identity in a sale of assets. *Cf.* La.R.S. 6:4, which sets forth the circumstances under which a bank may sell its assets, with La. R.S. 6:271 *et seq.* which sets forth the circumstances under which a bank may merge with another bank. This particular transaction, involving the merger of a state bank into a national bank, is governed by federal laws. 12 U.S.C. § 215a. Under the applicable provision of this law it is contemplated that one of the banks will survive and will thereafter possess all of the rights, privileges and franchises of the acquired bank. The surviving bank also becomes responsible for all of the liabilities and obligations of the acquired bank under the statute. 12 U.S.C. § 215a(a)(e). Moreover, if all mergers could properly be characterized as acquisitions of assets, subsection (4), which prohibits certain mergers, would be superfluous. Even assuming that the proposed merger is an asset acquisition, there would still be no violation because FNBC is not a "subsidiary" as defined in the statute.

Subsection (4) prohibits a bank holding company or "subsidiary" thereof from merging with any other bank holding company or "subsidiary" thereof. A careful analysis of the actual proposed transaction, as opposed to the transaction plaintiff's counsel has described, makes it apparent that neither the Preliminary Merger nor the Merger will violate this provision. The Preliminary Merger involves the merger of NOBS, a bank holding company, with NOBS Financial Corporation, an ordinary business corporation, a non-bank subsidiary of BNO—not with a "subsidiary" of another bank holding company. There is nothing in the Act which prohibits such a transaction. The Merger involves the merger of BNO, a publicly held state bank (neither a bank holding company nor a "subsidiary" thereof) with FNBC, a national bank which is owned by a bank holding company but which is not a "subsidiary" of a bank holding company within the meaning of the Act.

It is also important to note that the transaction does not result in a situation which would circumvent the prohibition against multi-parish banking. Since both banks are located in Orleans Parish, there is no threat to single-parish banking. Moreover, allowing this transaction to occur will not establish a precedent which would allow a subsequent similar transaction involving banks in different parishes. A merger of two state chartered commercial banks in different parishes would, as in the case of an asset acquisition, be a practical impossi-

bility because after such a merger both banks would have to be consolidated in one parish or would have to close its doors. Otherwise, the resulting state commercial bank would be in clear violation of state laws prohibiting branching across parish lines. Consequently, the proposed transaction poses no threat to the legislative purpose of the Act.

The prohibitions contained in Subsection (5)–(8) are so clearly inapplicable to the proposed transaction as not to be worthy of further comment.

Even as written, then, the Louisiana Bank Holding Company Act does not apply to the instant merger. Recent Louisiana legislation, moreover, clarifies the ability of the banks to merge. L.S.A.–R.S. 6:271, passed by Act 830 of 1982, provides:

Any two or more banks formed under the provisions of this Chapter or of Chapter 4 of this Title, and any one or more banks formed under the provisions of this Chapter or of Chapter 4 of this Title and any one or more banks formed under the laws of the United States, may be:

(1) Merged into one of the banks, or

(2) Consolidated into a new bank.

The merger must be effected only as a result of a joint agreement entered into, approved and filed. R.S. 6:272.

Prior to the enactment of this 1982 legislation, there was no bank merger legislation applicable to state chartered banks. Those institutions had merged over the years most often applying the provisions of the Louisiana Business Corporation law, R.S. 12:1 *et seq.* Act 830 of 1982 filled this gap in the state law by adopting applicable provisions from Title 12 into Title 6.

The legislative history of Act 830 of 1982 reflects an even more specific reason for adoption of the legislation. For some time previous to adoption of the act, Louisiana banks had formed one-bank holding companies by means of a merger using a "phantom bank." This practice had been approved by the Commissioner over an extended period of time, as was recognized in Louisiana Attorney General Opinions No. 81–1094A and 83–804. This practice was one of the main reasons for adoption of Act 830. The act itself contemplates such a chain of events because it specifically provides:

"(9) An agreement of merger or consolidation may provide that any consideration to be delivered to shareholders of any party to the consolidation or merger may consist of shares or secured or unsecured obligations *of any corporation* or bank . . . ." R.S. 6:272(9) (Emphasis added)

Moreover, Acts 466 and 468 of 1981 contemplate a "phantom bank" merger procedure.

At first blush, the "phantom bank" procedure might appear to violate R.S. 6:1003(3) or (4). Since the merger act is later legislation one may simply conclude that the later expression of the legislature will take precedence and that the conflicting provisions of the Bank Holding Company Act are repealed. 1A, C. Sands, *Sutherland on Statutory Construction,* at 139–140 (4th ed. 1973). Moreover, Acts 1982, No. 830, § 5 expressly repeals all laws or parts of laws in conflict, while § 2 prohibits impairing the validity of bank mergers or consolidations authorized prior to the effective date of the Act. Therefore, even if the Louisiana Bank Holding Company Act prohibited bank mergers prior to the enactment of Act 830, such prohibition has been legislatively repealed.

Accordingly, plaintiff's motion for summary judgment against the Comptroller of the Currency in C.A. 83–2021, or in the alternative for abstention, based on the applicability of L.S.A.–R.S. 6:1001 *et seq.,* is DENIED.

As there was no violation of the Bank Holding Company Act in the instant proceeding, the authority of Commissioner Wagner to issue a certificate of authority, R.S. 6:241, and to refuse to issue a cease and desist order, R.S. 6:168, was proper.

■ Furthermore, the contention of plaintiff that Commissioner Wagner violated the Louisiana Administrative Procedure Act ("A.P.A."), L.S.A.–R.S. 49:951, in failing to respond properly to his request for an

order prohibiting the merger, is also without merit.

The defendant Commissioner has acknowledged that the Office of Financial Institutions is an entity governed by the A.P.A., and that the provisions of the Act must be applied to him where appropriate. An examination of the Act however leads to the inescapable conclusion that the A.P.A. contains no provision, as alleged by plaintiff, requiring the commissioner to give notice or hold a hearing in the instant case.

Plaintiff apparently regards the failure to issue a cease and desist order opposing the merger as a final decision within the meaning of the A.P.A., thus entitling him to file suit for the Commissioner's failure to give appropriate notice and hearing. The relevant portion of the Act, L.S.A.–R.S. 49:951(3), reads as follows:

> "Decision" or "order" means the whole or any part of the final disposition (whether affirmative, negative, injunctive, or declaratory in form) of any agency, in any matter other than rulemaking, required by constitution or statute to be determined on the record after notice and opportunity for an agency hearing, and including non-revenue licensing, when the grant, denial, or renewal of a license is required by constitution or statute to be preceded by notice and opportunity for hearing.

Since the Bank Merger Act, as explained *infra* at 31–32, does not require the Commissioner's decision about the bank merger "to be determined on the record after notice and opportunity for an agency hearing", it is not a "decision" or "order" within the meaning of the A.P.A. As the Louisiana Supreme Court noted:

> unless there is some provision in the constitution or statutes requiring a hearing, an agency disposition is not a "decision" or "order" as defined for purposes of the Act [A.P.A.].

> \* \* \* \* \* \*

> [T]he Administrative Procedure Act does not create an independent right to a hearing before any state agency can take any

action. It merely sets forth the procedures to be followed if the agency is required to hold a hearing by the constitution or the statutory authority under which the agency is acting. *Delta Bank and Trust Co. v. Lassiter,* 383 So.2d 330, 333 (La.1980).

*Accord, First National Bank of Abbeville v. Sehrt,* 246 So.2d 382 (La.App. 1st Cir.1971), cert. denied, 248 So.2d 334 (La.1971); *First Federal Savings & Loan Association v. Smith,* 327 So.2d 657 (La.App. 1st Cir.1976), cert. denied, 329 So.2d 431 (La.1976).

As these cases discuss, there is no statutory requirement that the Commissioner adjudicate or otherwise hold a hearing. The Commissioner must *inter alia* examine the qualifications, responsibilities and standing of the persons organizing an association or bank, and refuse to issue a certificate of authority if he finds that the public interest will not be served by the new association. R.S. 6:241. Neither this statute nor any other requires that the commissioner hold a hearing before issuing a certificate of authority.

This necessary result holds true even where, as in *First National Bank of Abbeville, supra,* a conditional certificate of authority was issued. Although the Commissioner has much discretion in deciding whether to issue a certificate of authority, the legislature simply did not intend that his decision be preceded by notice and a hearing. *Delta Bank & Trust Company, supra,* at 335.

Accordingly, plaintiff's motion for preliminary injunction and a writ of mandamus to the Commissioner of Financial Institutions in C.A. 83–2261 is DENIED.

■ Plaintiff has also asked for a preliminary injunction based on the contention that the Comptroller's approval of the proposed transaction violates the Administrative Procedure Act, 5 U.S.C. § 702 ("APA"), in that the Comptroller failed "... to hold a hearing [on the application] as requested ..." and "... the decision as rendered failed to advert to the serious issues of law and fact brought to the attention of defend-

ant by and on behalf of petitioner...." Petition, ¶¶ 15, 17. Both claims are meritless.

■ First of all, the record in this case fails to disclose *any* comments or requests for hearings timely filed with the OCC *by this plaintiff.* Under these circumstances, the plaintiff can hardly contend he was denied the "right to comment and to be heard," Petition, No. 83–2021, at ¶ 17, or complain about the OCC's alleged "fail[ure] to advert to serious issues of law and fact," *Id.,* ¶ 17, which he himself failed to comment upon to the OCC. "[A] litigant may not withhold his objections, await the outcome, and then complain that he was denied his rights if he does not approve the resulting decision." *Brotherhood v. St. Louis Southwestern R. Co.,* 676 F.2d 132, 137 (5th Cir.1982), *quoting, Brotherhood v. Chicago, M., St. P., & P. RR,* 380 F.2d 605, 609 (D.C.Cir.1967), *cert. denied,* 389 U.S. 928, 88 S.Ct. 289, 19 L.Ed.2d 279 (1967). Plaintiff's failure to make timely request for a hearing is equally dispositive. *Brotherhood v. St. Louis Southwestern R. Co., supra,* 676 F.2d at 137–138. *See, United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952) (alleged failure to comply with the Administrative Procedure Act could not *first* be raised on petition filed in District Court). The Supreme Court in *Tucker Truck Lines* stated:

> Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice. 344 U.S. at 37, 73 S.Ct. at 69.

Even assuming, however, that the general rule should not hold and plaintiff should be considered a person aggrieved within the meaning of the statute, plaintiff has not alleged a violation by the Comptroller of a protected right. Rather, the record reveals that the Comptroller followed all the necessary procedures in this case.

■ With respect to plaintiff's claim that the Comptroller failed to hold a hearing on the application, it is well-established that there is no right to any hearing at all on corporate applications under consideration by the Comptroller. *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens Bank of Hattiesburg v. Camp,* 387 F.2d 375 (5th Cir.1968), *cert. denied,* 391 U.S. 904, 88 S.Ct. 1652, 20 L.Ed.2d 418; *First Nat. Bank of Fairbanks v. Camp,* 465 F.2d 586, (D.C.Cir.1972), *cert. denied,* 409 U.S. 1124, 93 S.Ct. 936, 34 L.Ed.2d 256; *First Bank & Trust Co. v. Smith,* 509 F.2d 663 (1st Cir.1975); *First Nat. Bank of Smithfield v. Saxon,* 352 F.2d 267 (4th Cir.1965); *Citizens Bank, American Bank & Trust Co. v. Saxon,* 248 F.Supp. 324 (W.D.Mich.1965); *First Nat. Bank of Crown Point v. Camp.,* 342 F.Supp. 871 (N.D.Ind. 1971), *aff'd,* 463 F.2d 595 (7th Cir.1972); *State Bank of Fargo & Merchants Nat. Bank of Fargo,* 451 F.Supp. 775 (D.N.D. 1978), *aff'd,* 593 F.2d 341 (8th Cir.1978); *Webster Groves Trust Co. v. Saxon,* 370 F.2d 381 (8th Cir.1966).

Although not required by law to hold hearings, the Comptroller has published Regulations, 12 C.F.R. § 5.10, providing for the conduct of informal hearings, in cases where, *in his sole discretion,* he believes such would be helpful to the decision making process. Regulation 12 C.F.R. § 5.10 provides that written requests for a hearing are to be submitted to the Regional Office within the three week period following the date of the last published notice of the application.

The failure to hold an administrative hearing in this case can be ascribed either to the fact that no timely request for one was filed and/or that the Comptroller determined pursuant to § 5.10(b)(3) that written submissions would be adequate and that a hearing would not be beneficial to the decision-making process.

■ In addition, plaintiff claims that the Comptroller violated the APA by failing to respond at all to his request for hearing. Plaintiff cites the provisions of 5 C.F.R.

§§ 10(b)(3) and (c) which state in applicable part:

> (b)(3): Written requests for hearings . . . shall be evaluated by the Regional Administrator, who may grant or deny such requests in whole or in part (or may refer such requests in whole or in part to the Washington Office for decision).
>
> (c): Action on requests for hearings . . . . if a request for a hearing has been made and denied, the Regional Administrator shall notify the applicant and all interested persons and shall state the reasons for the denial.

As the request for a hearing was not timely made, and the Comptroller clearly has the discretion in any case not to have a hearing, the Court finds any error resulting from the failure to explicitly deny plaintiff's request to be harmless. Moreover, any error committed by the Comptroller in this regard falls far short of satisfying the requirements necessary to cause issuance of a preliminary injunction.

Plaintiff also claims that the Comptroller violated the APA by failing to consider (1) the provisions of Louisiana law, R.S. 6:1001 et seq., that prohibit the merger; (2) the opposition submitted; or (3) the adverse decision of the Federal Reserve Board.

The opposition submitted by plaintiff to the application made basically two substantive objections: (a) that the transaction would be anticompetitive; and (b) that it would violate state law. Thus, plaintiff's complaint with regard to the Comptroller's failure to consider certain issues boils down to two such issues: (1) that the merger would be anticompetitive, as suggested by the plaintiff and the "adverse" finding of the Fed.; and (2) that the merger would violate state law.

As regards the first issue, the lengthy reports in the administrative record and the written reasons for approving the application issued by the Comptroller clearly reveal that the competitive effects of the merger were considered. Any representation to the contrary is patently frivolous.

As regards the second issue, namely, that the merger would violate state law, the Comptroller received and acknowledged submissions on this issue not only from the plaintiff but from the applicant banks, who addressed the potential impact of state law and forwarded an opinion of counsel that the application was in accordance with applicable state law.

Moreover, under the Bank Merger Act, as discussed above, the Comptroller need not consider state law in an application for merger such as this.

Even assuming, however, both that state law was not considered in this case, and that it should have been considered, the Court has found herein, as a matter of law, that the proposed merger does not violate state law. Thus, any complaint with regard to the Comptroller's procedures on this point would be moot.

Moreover, any error committed by the Comptroller in this regard would clearly fall far short of satisfying the requirements necessary to cause issuance of a preliminary injunction.

Accordingly, plaintiff's motion for a preliminary injunction against the Comptroller in C.A. 83–2021, under 5 U.S.C. § 701 et seq., is DENIED.

Finally, since the Court has ruled that the Bank Merger Act applies to the proposed merger, the Court finds it necessary to address the issue of the applicability of the automatic stay provision of that Act, which reads as follows:

> Any action brought under the antitrust laws arising out of a merger transaction shall be commenced prior to the earliest time under paragraph (6) at which a merger transaction approved under paragraph (5) might be consummated. [That would be thirty days after approval by the Comptroller, except in situations found to warrant emergency treatment, which is not the case here.] The commencement of such an action shall stay the effectiveness of the agency's approval unless the court shall otherwise specifical-

ly order. In any such action, the court shall review de novo the issues presented. 12 U.S.C. § 1828(c)(7)(A).

A plain reading of this provision would lead to the conclusion that the action brought by plaintiff in the instant case should automatically stay the proposed merger, pending a resolution of plaintiff's antitrust claims. It is axiomatic, however, that no section of a statute should be read out of the context of the rest of that statute, and that no statute should be read out of the context of its clear legislative history, if any. Furthermore, a court has a duty to ascertain if any gloss has been put on a statute by judicial opinion.

In this case, an analysis of the Act itself, the congressional debates, the House Report, and the Senate Report leave little doubt that the automatic stay was intended to operate only in favor of the Attorney General and not in favor of any private plaintiff.

Apparently, there are only three cases on point, and they all arrived at the same conclusion. *First Midland Bank & Trust v. Chem. Finan. Corp.*, 441 F.Supp. 414 (W.D. Mich.1977); *State of Washington v. Heimann*, Civil Action No. 79–141S (W.D.Wash. 1979); *Blount v. State Bank & Trust Co.*, Civil Action No. 695 (D.D.N.C.1969).

First of all, the Court must recognize that the Bank Merger Act was enacted by Congress to protect the public interest by promoting continuity of banking services and preserving and enhancing competition in banking. The purpose of the Act is to protect the community by providing it with the most convenient and widest array of banking services possible since, in the face of competition, banks strive to provide better services to the community. *See U.S. v. Third National Bank in Nashville*, 390 U.S. 171, 182–183, 88 S.Ct. 882, 889–890, 19 L.Ed.2d 1015 (1968); 112 Cong.Rec. 2451; 2441–2; 2455, 2452, and 2655. As the Supreme Court pointed out in *U.S. v. Third National Bank in Nashville, supra,* 390 U.S. at 184, 88 S.Ct. at 890, "the public interest"

was the ultimate test imposed. *See* H.Rep. No. 1221, 89 Cong. 2d Sess. (1966), at 2.

Correspondingly, the Act creates a comprehensive scheme for determining the legality of mergers, *prior to* their approval by the Comptroller, based on reports not only from within the Comptroller's office but from the Justice Department, the FDIC, and the Federal Reserve Board. In short, four federal agencies are involved in evaluating a proposed merger in light of the public interest. Furthermore, upon approval of a merger application by the Comptroller, the Act provides for immediate notification of the Attorney General, presumably so that he may bring suit, if he deems it in the public interest to do so, before the thirty-day period is up.

In furtherance of this intent, the Congress also enacted the automatic stay provision, but not without serious concern over the implicit power of that provision to stop *any* merger, good or bad, dead in its tracks.

In fact, Congress attempted to circumscribe the exercise of that power, as evidenced by the remarks of Chairman Robertson of the Senate Banking and Currency Committee:

> The critics felt that this provision [for an automatic stay] gave the Justice Department an absolute veto over bank mergers. All the Department would have to do would be to file a mimeographed complaint attacking a merger, and the banks would abandon the merger, partly because the 2- or 3-year delay in consummating the merger would make any agreement entered into outdated by the time the merger could be effective, assuming the case was eventually won. The Banking and Currency Committee recognized this problem, and in our report on the bill we warned the Department of Justice to exercise this power with restraint.

112 Cong. Rec. 2542 (daily ed. Feb. 9, 1966), *cited in First Midland, supra,* 441 F.Supp. at 422.

If the Congress had intended the automatic stay provision to apply to private plaintiffs, surely its concern would have

been much greater. If worried that the Justice Department, a federal agency committed to acting in the public good, would freeze bank mergers, it is not unreasonable to assume that the thought that any private plaintiff could step in and stop a merger simply by filing suit would have been enough to prevent the enactment of the provision altogether.

The Reports of the Senate and House Committees further substantiate this analysis. The Report of the Senate Committee on Banking and Currency, S.Rep. No. 299, 89th Cong., 1st Sess. 1 (1965) declared:

> The bill would require that future bank mergers should not be consummated until 30 days after the date of approval by the appropriate banking agency under the Bank Merger Act. *If the Justice Department* did not institute a suit under the antitrust laws during this 30-day period the merger could be consummated and would thereafter be exempt from the Sherman Act and the Clayton Act. [Emphasis added.]

The Report of the House Committee on Banking and Currency, H.R.Rep. No. 1179, 89th Cong., 1st Sess. 10 (1965) stated:

> In all except emergency situations, a 30-day waiting period is provided after agency approval of a merger to give the *Attorney General* an opportunity to challenge it in court. [Emphasis added.]

*Cited in First Midland Bank & Trust v. Chemical Financial Corp.*, 441 F.Supp. 414, 422 (W.D.Mich.1977).

Furthermore, as pointed out by the court in the *Heimann* case, at p. 3 of the oral opinion, it would certainly seem that if Congress had intended the automatic stay provision to apply to private litigants, it would have fashioned a bond requirement in the event that the stay was later found to have been improper. Indeed, it strains reason to think that Congress would allow a stay in this situation without a bond, when under the Federal Rules of Civil Procedure a court cannot even issue a temporary restraining order, much less a longstanding preliminary injunction, without one.

Indeed, an automatic stay under this statute is, in effect, a preliminary injunction. As such, it would seem that Congress would only have intended it, if the plaintiff could satisfy the usual requirements for a preliminary injunction in addition to the bond requirement. It is reasonable to assume that, in the case of the Justice Department, the Congress would be content to trust in its obligation to the public good to bring such actions without a bond and without satisfying the usual requirements for a preliminary injunction. A private plaintiff, however, is another matter altogether, as his interests, no matter how stated, may well not be those of the public good.

In the instant case, plaintiff attempts to invoke the automatic stay provision by purporting to act as a "private attorney general." This characterization is belied, however, by his assertion that his standing to bring suit in the matter is based on his position as a real estate venture capitalist, who will suffer injury in fact if interest rates on loans rise as a result of lessened competition. As such, plaintiff simply cannot claim to be representing the public interest. Rather, the Act contemplates that the public interest will be carefully represented by the four federal agencies charged to evaluate the merger.

In sum, the automatic stay provision of the Act was obviously not intended to apply in a situation such as this, where a private citizen, with a speculative claim based on injury to his own property interests, files suit to enjoin a merger to which the governmental agencies involved, all of which represent the public interest, have given their imprimatur of approval.

Indeed, to allow an automatic stay in this case would be to cause great harm not only to the bank defendants, who anticipate savings of five to ten million dollars a year as a result of the merger, but to the public good, as interpreted by the federal agencies involved in the approval of the merger. ·

On the other hand, without a stay, plaintiff's interests are not irreparably harmed. He still has the right to proceed with his suit, and if he prevails, to cause divestiture

of the merger. Although not without its own costs, the risk of allowing divestiture at some future point seems preferable to allowing a private plaintiff to freeze an approved merger merely by filing suit.

Even if the automatic stay provision of the Bank Merger Act were applicable to the plaintiff in the instant suit, the Court would lift the stay, as provided for in the Act, for the following reasons: (1) plaintiff's claim that the merger would cause him injury in fact is, at this point, speculative; (2) a failure to stay the merger would not cause him irreparable harm, as he may still pursue his suit and cause divestiture of the merger, or possibly institute a new suit for treble damages; (3) to stay the merger would cause the bank defendants great harm, i.e., an estimated five to ten million dollars a year in savings anticipated from the merger; (4) to stay the merger would not be in the public interest, as interpreted by the federal agencies involved in the approval of the merger.

In other words, if the Court were to apply the standards for a preliminary injunction to the question of lifting the stay, the plaintiff would fail on each and every ground of the four grounds necessary for issuance thereof. In addition, plaintiff would, by his own admission, be able to post only a $50,000 cash bond, far less than the amount the Court would find necessary to impose to protect the interests of the defendants.

Accordingly, for all of the reasons stated,

IT IS ORDERED that the automatic stay provision of the Bank Merger Act does not apply to the plaintiff in the instant suit, and, in the alternative, that if the provision does apply, the automatic stay be and it is hereby lifted.